**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANONE, US, LLC,

                    Plaintiff,

          -v-

CHOBANI, LLC,

                    Defendant.

Case No. 1:18-CV-11702

**CHOBANI, LLC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**DENYING DANONE, US, LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

Jamie A. Levitt
Adam J. Hunt
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Tel: (212) 468-8000

*Attorneys for Defendant Chobani, LLC*

ny-1357705

## TABLE OF CONTENTS

**Page**

PROPOSED FACTS ................................................................................................ 1

    A.    Chobani. ........................................................................................ 1

    B.    Dannon ........................................................................................... 1

    C.    Chobani's Gimmies™ Milkshakes. ........................................... 3

    D.    Chobani's Current Advertising and Labeling of Its Gimmies™
          Milkshakes. ................................................................................ 4

    E.    Chobani Has Reformulated Two Flavors of the Gimmies™ Milkshakes
          and Is Revising Its Advertising and Labeling Accordingly. ................ 11

    F.    Chobani Will Suffer Serious Harm if a Preliminary Injunction Issues ............... 14

    G.    Procedural History ..................................................................... 16

PROPOSED CONCLUSIONS OF LAW ............................................................... 17

I.      LEGAL STANDARDS ............................................................................ 17

    A.    Allowable Advertising Under Applicable Food Laws and Regulations ............. 17

    B.    Section 43(a) of the Lanham Act .............................................. 20

    C.    New York General Business Law § 349 .................................... 20

    D.    Preliminary Injunctions ............................................................. 21

II.     DANNON FACES NO ACTUAL OR THREAT OF IRREPARABLE INJURY
       WITH CHOBANI'S EXISTING OR REFORMULATED GIMMIES™
       MILKSHAKES. ....................................................................................... 22

    A.    Monetary Damages Can Remedy Dannon's Alleged Injury (If Any). ............... 22

    B.    Chobani Is Reformulating the Two Flavors of the Gimmies™ Milkshakes
          at Issue and Changing Its Labeling, and Thus Dannon's Claim of
          Irreparable Injury Is Moot. ........................................................ 24

    C.    Dannon Cannot Establish Irreparable Harm Because the Challenged
          Statements Are Literally True and Not Misleading. ................... 26

    D.    Dannon's Purported Expert Report and Consumer Survey Are
          Inadmissible, Should be Given no Weight, and Provide No Evidence of
          Confusion. .................................................................................. 31

III.    DANNON IS UNLIKELY TO PREVAIL ON THE MERITS OF ITS LANHAM
       ACT CLAIM. ........................................................................................... 40

    A.    Chobani's 33% Claim Is Not Literally False. ............................ 40

    B.    There Is No Evidence that Consumers Are Likely to Be Misled by
          Chobani's Advertising. .............................................................. 43

IV.     DANNON IS UNLIKELY TO PREVAIL ON ITS NY GBL § 349 CLAIM.................43

V.     THE BALANCE OF EQUITIES FAVORS CHOBANI.................................................45

CONCLUSION...................................................................................................................48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AIM Int'l Trading LLC v. Valcucine SpA*,
  188 F. Supp. 2d 384 (S.D.N.Y. 2002)......................................................................22

*Am. Beverage Corp. v. Diageo N. Am., Inc.*,
  936 F. Supp. 2d 555 (W.D. Pa. 2013).....................................................................23

*Am. Express Travel Related Servs. Co. v. MasterCard Int'l, Inc.*,
  776 F. Supp. 787 (S.D.N.Y. 1991)..........................................................................26

*Arch Assocs., Inc. v. Hedaya Bros., Inc.*,
  No. 93 Civ. 4267 (RWS), 1993 U.S. Dist. LEXIS 14791 (S.D.N.Y. Oct. 21,
  1993) ........................................................................................................................47

*Brandywine Prod. Grp. Int'l v. Univ. Distribution Ctr. LLC*,
  No. 2:16-cv-02248 (WJM), 2016 U.S. Dist. LEXIS 132195 (D.N.J. Sept. 27,
  2016) ........................................................................................................................23

*Broker Genius, Inc. v. Zalta*,
  280 F. Supp. 3d 495 (S.D.N.Y. 2017)......................................................................21

*C.D.S., Inc. v. Zetler*,
  217 F. Supp. 3d 713 (S.D.N.Y. 2016)......................................................................21

*Cablevision Sys. Corp. v. Verizon N.Y. Inc.*,
  119 F. Supp. 3d 39 (E.D.N.Y. 2015) .......................................................................26

*ComponentOne, L.L.C. v. ComponentArt, Inc.*,
  No. 02:05cv1122, 2008 U.S. Dist. LEXIS 87066 (W.D. Penn. Oct. 27, 2008).......34

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).................................................................................................32

*Eli Lilly & Co. v. Arla Foods Inc.*,
  No. 17-C-703, 2017 WL 4570547 (E.D. Wis. June 15, 2017) ................................48

*Estrella v. Menifee*,
  No. 02 Civ. 6114, 2003 U.S. Dist. LEXIS 1134 (S.D.N.Y. Jan. 24, 2003)............22

*FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*,
  No. 14–CV–3685 (SJF)(SIL), 2015 U.S. Dist. LEXIS 89415 (E.D.N.Y. July
  8, 2015) ....................................................................................................................26

*Greenlight Capital, Inc. v. GreenLight (Switz.) S.A.*,
  No. 04 Civ. 3136, 2005 U.S. Dist. LEXIS 2 (S.D.N.Y. Jan. 3, 2005)...............................44, 45

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
  277 F. Supp. 2d 269 (S.D.N.Y. 2003)........................................................................20, 21, 44

*Healthpoint, Ltd. v. Stratus Pharm., Inc.*,
  273 F. Supp. 2d 769 (W.D. Tex. 2001)..................................................................................48

*Hershey Co. v. Promotion in Motion, Inc.*,
  No. 07–cv–1601 (SDW), 2013 WL 12157828 (D.N.J. Jan. 18, 2013)............................34, 35

*Johnson & Johnson v. Carter-Wallace, Inc.*,
  631 F.2d 186 (2d Cir. 1980)...................................................................................................22

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04 Civ.7203(DLC), 2006 U.S. Dist. LEXIS 20787 (S.D.N.Y. Apr. 19,
  2006) ...............................................................................................................33, 36, 37, 38

*Kompan A.S. v. Park Structures, Inc.*,
  890 F. Supp. 1167 (N.D.N.Y. 1995)......................................................................................46

*KRBL Ltd. v. Overseas Food Distribution, LLC*,
  No. 1602341, 2016 U.S. Dist. LEXIS 93374 (C.D. Cal. May 26, 2016) ...............................47

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)...............................................................................32, 33

*Medisim Ltd. v. BestMed LLC*,
  861 F. Supp. 2d 158 (S.D.N.Y. 2012)...............................................................................33, 38

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014)...............................................................................................20, 40

*NewMarkets Partners LLC v. Oppenheim*,
  No. 08 Civ. 4213(WHP), 2008 U.S. Dist. LEXIS 99808 (S.D.N.Y. Dec. 3,
  2008) .................................................................................................................................23, 30

*Newport Pac. Corp. v. Moe's Sw. Grill, LLC*,
  No. 05-995-KI, 2006 U.S. Dist. LEXIS 74481 (D. Or. Sept. 28, 2006)................................34

*Nokia Corp. v. Interdigital, Inc.*,
  645 F.3d 553 (2d Cir. 2011).................................................................................................47

*P&G v. Chesebrough-Pond's, Inc.*,
  588 F. Supp. 1082 (S.D.N.Y. 1984), *aff'd*, 747 F.2d 114 (2d Cir. 1984).......................21, 44

iv

*P&G v. Ultreo, Inc.*,
   574 F. Supp. 2d 339 (S.D.N.Y. 2008) ................................................................22, 23, 32, 43

*Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*,
   881 F. Supp. 2d 470 (S.D.N.Y. 2012) ................................................................................30, 43

*RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*,
   No. 14CV6294, 2015 U.S. Dist. LEXIS 111823 (S.D.N.Y. Aug. 24, 2015) ..........................45

*Silber v. Barbara's Bakery, Inc.*,
   950 F. Supp. 2d 432 (E.D.N.Y. 2013) ...................................................................................46

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck*
   *Consumer Pharm. Co.*,
   No. 01 Civ. 2775, 2001 U.S. Dist. LEXIS 7061 (S.D.N.Y. June 1, 2001) ............................30

*SQP, Inc. v. Sirrom Sales, Inc.*,
   130 F. Supp. 2d 364 (N.D.N.Y. 2001) ...................................................................................43

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
   646 F. Supp. 2d 510 (S.D.N.Y. 2009) ........................................................................25, 30, 43

*Tang Capital Partners, LP v. Cell Therapeutics, Inc.*,
   591 F. Supp. 2d 666 (S.D.N.Y. 2008) (McMahon, J.) ...........................................................21

*THOIP v. Walt Disney Co.*,
   788 F. Supp. 2d 168 (S.D.N.Y. 2011) ..............................................................................33, 37

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007) ...................................................................................................29

*In re Tobacco Cases II*,
   240 Cal. App. 4th 779 (2015) ...........................................................................................35, 38

*Trouble v. Wet Seal, Inc.*,
   179 F. Supp. 2d 291 (S.D.N.Y. 2001) ...................................................................................33

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
   277 F.3d 253 (2d Cir. 2002) ...................................................................................................23

*WE Media, Inc. v. Gen. Elec. Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002) ...................................................................................33

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ....................................................................................................................21

v

**Other Authorities**

21 C.F.R.

    § 101.9 *et seq.* ...................................................................................................10, 17, 27

    § 101.12 ..........................................................................................................................18

    § 101.13 *et seq.* ...............................................................5, 6, 8, 9, 18, 19, 20, 24, 39, 41

    § 101.60(c)(5)(i) ............................................................................................................18

58 Fed. Reg. 2302, 2362-63 (Jan. 6, 1993) ............................................................................7

Federal Rule Civil Procedure 65(c) .......................................................................................47

## PROPOSED FACTS

**A.     Chobani.**

1.     Chobani opened its first factory in South Edmeston, New York in 2005. (Sandfort Direct[1] ¶ 2.)

2.     Chobani is currently the best-selling Greek yogurt brand and competes for the top spot in the overall U.S. yogurt market with established companies such as Dannon and Yoplait. (*Id.* ¶ 3.)

3.     This case involves Chobani's new children's drinkable yogurts, specifically two flavors of the Chobani® Gimmies™ Milkshakes, Bizzy Buzzy Strawberry and Cookies & Cream Crush, with labeling stating that these flavors have "33% less sugar than the leading kids' drinkable yogurt" and a disclosure explaining the basis for that claim.  Although that claim is literally true and not misleading, Dannon's application for a preliminary injunction is moot, because Chobani has ***reformulated*** those two flavors of Gimmies™ Milkshakes challenged by Plaintiff, and each 4.0 fluid ounce container of Buzzy Buzzy Strawberry and Cookies & Cream Crush flavors produced after January 9, 2019 contains 8 grams of sugar.  (*Id.* ¶¶ 42-49.)  Further, Chobani has changed the labeling for these reformulated flavors, and revised labels bearing a "30% less sugar" claim will be ready for production on or around February 10, 2018.  (*Id.*)

**B.     Dannon**

4.     Dannon is a producer of a number of yogurt and dairy products that compete directly with Chobani.  (Goodwin Decl. ¶¶ 7-8.)

5.     One of the brands Dannon sells is Danimals®, which includes kids' drinkable yogurt product Danimals® Smoothies.  (*Id.* ¶¶ 8, 12.)

---

[1] "Sandfort Direct" refers to the Direct Testimony Affidavit of Niel Sandfort in Support of Chobani, LLC's Proposed Findings of Fact and Conclusions of Law Denying Danone, US, LLC's Motion for a Preliminary Injunction, dated January 10, 2019.

6. Dannon produces eight different flavors of the Danimals® Smoothies—a "drinkable" yogurt—all of which are packaged in 3.1 fluid ounce containers. (Sandfort Direct ¶ 18; Goodwin Decl. ¶ 19.)

7. At least as of January 7, 2019, data from Mintel, Nielsen, and via Instacart (an online grocery store), states that three Danimals® Smoothies flavors (Strikin' Strawberry Kiwi, Wild Watermelon, and Orange Cream) contain 10 grams of sugar per 3.1 fluid ounce serving and five Danimals® Smoothies flavors (Strawberry Explosion, Swingin' Strawberry Banana, Rockin' Raspberry, Banana Split, and Cotton Candy) contain 9 grams of sugar per 3.1 fluid ounce serving. (Sandfort Direct ¶¶ 18-20; DX-006 – DX-010.)

8. All three flavors of Danimals® Smoothies products containing 10 grams of sugar per 3.1 fluid ounces (Strikin' Strawberry Kiwi, Wild Watermelon, and Orange Cream) are currently available for sale in retail locations. (Sandfort Direct ¶ 20; DX-001.)

9. Accordingly, the average amount of sugar in Dannon's Danimals® Smoothies is 9.375 grams per 3.1 fluid ounces, or 3.02 grams of sugar per fluid ounce. (Sandfort Direct ¶ 21.)

10. Despite the market data and the availability of all three of the Danimals® Smoothies products with 10 grams sugar per 3.1 fluid ounces currently available for sale at retail locations, Dannon misleadingly asserts that all eight flavors of Danimals® Smoothies currently contain 9 grams of sugar per 3.1 fluid ounces. (*See* Compl. ¶¶ 25, 45, ECF No. 1.)

11. According to market research data, sales of Dannon's Danimals® Smoothies as a percentage of the total yogurt sales in the United States have *increased* since December 1, 2018. Indeed, as of December 29, 2018, the market share of Dannon's Danimals is *close to its highest point ever*. (Sandfort Direct ¶ 41; DX-014.) Similarly, "total distribution" of Danimals available at retail locations—a common industry benchmark for sales—has *increased* during the

2

period December 1, 2018 to December 29, 2018.  (*Id*.)

      **C.**    **Chobani's Gimmies™ Milkshakes.**

      12.    Several years ago, Chobani began developing a platform of yogurts specifically for children.  (Sandfort Direct ¶ 4.)

      13.    Specifically, Chobani designed a portfolio of nutrient dense yogurt products with only natural, non-GMO ingredients, and no artificial sweeteners or thickeners or artificial preservatives.  These products provide a good source of protein, calcium and probiotics and contain less sugar by volume than other children's yogurt products.  (*Id*. ¶ 5.)

      14.    Chobani spent over 16 months and millions of dollars to develop these children's yogurt products—Chobani® Gimmies™ product line—which is currently available in four formats, including Chobani® Gimmies™ Milkshakes, a "drinkable" yogurt.  (*Id*. ¶ 6.)

      15.    Chobani launched Gimmies™ Milkshakes on November 29, 2018, and the drinkable yogurts were available in retail locations starting in or around December 7, 2018.  (*Id*. ¶ 10.)

      16.    All of the Gimmies™ Milkshakes are packaged and labeled in accordance with applicable federal and state regulations, including a "nutrition information" label.  (DX-012.)

      17.    Each Gimmies™ Milkshake is sold in a container with a 4.0 fluid ounce net weight.  (*See id*.)

      18.    Although Chobani contemplated manufacturing a 3.1 fluid ounce bottle, Chobani decided to produce Gimmies™ Milkshakes in a 4.0 fluid ounce container based on consumer research, including determining that that size was most responsive to consumer needs and wants, and because the 4 fluid ounce serving provides 6g protein, which aligns with Chobani's nutrient targets.  (Sandfort Direct ¶¶ 7-9.)

ny-1357705

19.     Three different flavors are available of Gimmies™ Milkshakes: Bizzy Buzzy Strawberry, Cookies & Cream Crush, and Chillin' Mint Chocolate.  (*Id*. ¶ 12.)

20.     Each 4.0 fluid ounce container of the Chillin' Mint Chocolate flavored Gimmies™ Milkshakes contains 7 grams of sugar.  (*Id*.)

21.     Until January 9, 2019, each 4.0 fluid ounce container of the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes contained 9 grams of sugar.  (*Id*.)  As described below, each 4.0 fluid ounce container of Buzzy Buzzy Strawberry and Cookies & Cream Crush flavors produced after January 9, 2019 contains 8 grams of sugar.  (*Id*.)

**D.     Chobani's Current Advertising and Labeling of Its Gimmies™ Milkshakes.**

22.     Chobani's advertising and labeling of its Gimmies™ Milkshakes complies with the FDA regulations for nutrient panel listings as well as permissible comparative advertising, which is common in the highly competitive food manufacturing industry.  (*See infra* Section I.A.)

23.     Chobani truthfully advertises the net weight of each Gimmies™ Milkshake as 4.0 fluid ounces.  (DX-015.)

24.     Chobani declares on the label, in the Nutrition Facts panel, the sugar content in all three flavors of its Gimmies™ Milkshakes.  Each 4.0 fluid ounce container of the Chillin' Mint Chocolate flavored Gimmies™ Milkshakes contains 7 grams of sugar.  (*Id*.)  Each 4.0 fluid ounce container of the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes produced prior to January 9, 2019 contained 9 grams of sugar, and those products produced after January 9, 2019 contain 8 grams of sugar.  (DX-015, DX-016.)

25.     On the paperboard overwrap labels (the cartons which hold the bottles and contain all requisite information required for sale of the product, *e.g.*, manufacturer's information, list of ingredients, and Nutrition Facts panel) of the Gimmies™ Milkshakes products, Chobani asserts

that the Gimmies™ Milkshakes products contain "33% less sugar*."  (Sandfort Direct ¶ 13.)

Immediately adjacent to the claim, clarifying language states "*than the leading kids' drinkable

yogurt."  (*See* DX-015.)

26.     On the back label under the Nutrition Facts panel, Chobani makes clear the basis

for this claim and the fact that it is based on average sugar content by volume using an "apples-

to-apples" comparison: "*Chobani® Gimmies™ Milkshakes: avg. 8g sugar; leading kids'

drinkable yogurt: avg. 12g sugar per 4 fl oz serving."  (*Id*. ¶ 14; DX-015.)  This disclosure

complies with the FDA's font requirements for disclosures.  *See* 21 C.F.R. § 101.13(i)(2)(iv)(A).

27.     Chobani included these statements on the back of its packaging to clarify for

consumers what the "33% less sugar" claim means.  (Sandfort Direct ¶ 16.)

28.     Directly below the footnote explaining the 33% claim is another footnote stating:

"**Chobani® Gimmies™ Milkshakes: net 4 fl oz; leading kids' drinkable yogurt: net 3.1 fl oz,"

which clarifies the claim on the label that the Gimmies™ Milkshakes are "20% larger" than the

leading kids' drinkable yogurt.  (*Id*.; DX-015.)

29.     Chobani determined based on market data from Nielsen that the "leading kids'

drinkable yogurt" is Dannon's Danimals Smoothies.  (Sandfort Direct ¶ 17.)

30.     Neither the claim nor the disclosure references "Dannon" or "Danimals"—it

refers only to "the leading kids' drinkable yogurt."  (DX-015.)

31.     As of June 2018, when Chobani performed its analysis and created the claim for

its marketing materials and labels based on Mintel and other market data, as well as what was

available on Dannon's own website, the containers were reported to contain the following sugar

content:

ny-1357705

| Danimals® Smoothie Version | Sugar Content |
|---|---|
| Strawberry Explosion | 9 grams |
| Swingin' Strawberry Banana | 9 grams |
| Rockin' Raspberry | 9 grams |
| Banana Split | 9 grams |
| Cotton Candy | 9 grams |
| Strikin' Strawberry Kiwi | 10 grams |
| Wild Watermelon | 10 grams |
| Orange Cream | 10 grams |

(Sandfort Direct ¶ 18; DX-011 – DX-013; *see also* DX-003 – 010.)

32.     At least as of January 7, 2019, market data available on Mintel, Nielsen, and via Instacart, listed the same sugar content for Danimals Smoothies as in the chart above. (Sandfort Direct ¶ 19; DX-003 – DX-010.)

33.     All three flavors of Danimals® Smoothies products containing 10 grams of sugar per 3.1 fluid ounces (Strikin' Strawberry Kiwi, Wild Watermelon, and Orange Cream) are currently available for sale in retail locations.  (Sandfort Direct ¶ 20; DX-001.)

34.     The FTC not only recommends, but *requires* that advertisers "make clear the basis for [a] comparison" between foods by, among other things, use of a "common standard of measurement."  (*Id.*; *see also* Federal Trade Commission, Enforcement Policy Statement on Food Advertising (May 13, 1994), *available at* https://www.ftc.gov/public-statements/1994/05/enforcement-policy-statement-food-advertising.) (the "FTC Food Advertising Guidance").

35.     FDA regulations permit Chobani to compare Gimmies™ to similar competitor foods.  21 C.F.R. § 101.13(j)(1)(ii) gives Chobani two regulatory pathways to make this comparison.

36.     Under the first path, "CFR Section A," Chobani is permitted to compare Gimmies™ to food that is "representative of the type of food that includes the product that bears the claim." *Id.* § 101.13(j)(1)(ii)(A).  Under CFR Section A, the nutrient value used for the competitor food needs to be "representative" of that type of food, such as "a value in a representative, valid data base; an average value determined from the top three national (or regional) brands, a market basket norm; or, where its nutrient value is representative of the food type, a market leader." *Id.*

37.     Chobani proceeded under CFR Section A and compared Gimmies™ to Danimals Smoothies, a "market leader" of kids' drinkable yogurts.  Danimals Smoothies' nutrient value is representative of the kids' drinkable yogurt "food type."

38.     In CFR Section A, FDA contemplates that manufacturers will be making claims as to competitor "foods."  There is no language limiting the comparisons to specific food *products* as opposed to general "food types" or product lines.  *See id.*  Databases such as the USDA National Nutrient Database for Standard Reference provide aggregate information on "food types," such as plain yogurt, Greek yogurt, and vanilla low-fat yogurt.  *See, e.g.*, USDA, National Nutrient Database for Standard Reference, Vanilla low-fat yogurt (available at https://ndb.nal.usda.com/ndb/foods/show/01119).  As such, averaging across various brands and within product lines is required to derive these calculations.  The FDA clearly contemplates these types of databases may be relied upon to develop comparative claims.  *See* 58 Fed. Reg. 2302, 2362-63 (Jan. 6, 1993).

39.     In the event that a competitor discontinues a product, it is the FDA's position that claims using that food for comparison are appropriate for six months after discontinuation of the product.  *See id.* at 2363.

40.     Similarly, CFR Section A expressly permits for averaging across several competitor products.  *See* 21 C.F.R. § 101.13(j)(1)(ii)(A).  Since competitor products may have varying nutritional content within a product line (such as Danimals, which has three flavors within the product line, each with slightly different nutritional value), a manufacturer is permitted to average nutritional values across brands and within product lines.

41.     The same is true for a comparison to a "market leader" under CFR Section A. This is the type of comparison Chobani made here.  To compare its Gimmies™ product line to Danimals Smoothies' product line, Chobani averaged the nutrient value of the products within the product line.  This was to ensure that the average sugar content it referenced for Danimals was "representative of the food type"— here, kids drinkable yogurt.

42.     Specifically, Chobani calculated the sugar content across the three products within the Gimmies™ product line:  Bizzy Buzzy Strawberry, Chillin' Mint Chocolate, and Cookies & Cream Crush.  The result was that, on average, the 4 fluid ounce containers of Gimmies™ contained 8.3333 grams of sugar, or 2.08 grams per ounce.  (Sandfort Direct ¶ 25.)

43.     Chobani then calculated the average amount of sugar in Danimals Smoothies product line—three flavors of which, according to an available database of market data, contain 10 grams of sugar per 3.1 fluid ounces and five flavors contain 9 grams of sugar per 3.1 fluid ounces.  (*Id.* ¶ 18.)  The regulation does not require manufacturers to independently validate the values from a data base, although Chobani did in this case.  *See* 21 C.F.R. § 101.13(j)(1)(ii)(A). The result is that, on average, the 3.1 fluid ounce containers of Dannon's Danimals Smoothies contain 9.375 grams per 3.1 fluid ounces, or 3.02 grams of sugar per fluid ounce.  (Sandfort Direct ¶ 21.)

44.     As such, Chobani complied with CFR Section A in comparing Gimmies™ to

Danimals Smoothies, "a market leader," using sugar values averaged across both Gimmies™

Milkshakes and Danimals Smoothies.

45.     Even though it proceeded under CFR Section A, Chobani's claim also complies

with the second available regulatory path, "CFR Section B."  Under CFR Section B, a

manufacturer can compare its food to that "of another manufacturer that has been offered for sale

to the public on a regular basis for a substantial period of time in the same geographic area . . . ."

21 C.F.R. § 101.13(j)(1)(ii)(B).  Under CFR Section B, the nutrient values that can be used for

purposes of a comparison are "either the values declared in nutrition labeling or the actual

nutrient values."  *Id.*  Either type of value is permissible, "provided that the resulting label is

internally consistent" by using the same type of value on each product.  *Id.*  The claim must also

"not cause consumer confusion."  *Id.*

46.     Chobani's claim complies with CFR Section B because Chobani added together

the sugar values "declared on nutrition labeling" (i.e., from the Nutrition Facts panels) of each

Danimals Smoothie flavor to calculate the average sugar value for the Danimals Smoothie

product line.  *Id.*  And the claim "will not cause consumer confusion" because Chobani's

quantitative disclosure explains the basis for its calculations.

47.     Because Chobani's Gimmies™ Milkshakes are sold in 4 fluid ounce containers,

not 3.1 fluid ounce containers like Danimals Smoothies, Chobani used a single common

measurement—4 fluid ounces—in order to compare the sugar content and to avoid any

confusion given the products' different volumes.  This allowed Chobani to accurately disclose to

its consumers the amount of sugar in its yogurt by volume compared to the amount of sugar in an

equivalent volume of Danimals Smoothies.  Chobani believes that its decision to select a

common standard of measurement for the comparison not only is consistent with, but is required

by, Federal Trade Commission guidance regarding comparative nutrient claims.  (Sandfort Direct ¶ 22.)

48.     On average, 4 fluid ounces of Dannon's Danimals Smoothies contain 12.08 grams of sugar (3.02 grams of sugar per fluid ounce multiplied by 4 fluid ounces).  Chobani rounded this number *down* to 12 grams for the purposes of making a comparison, consistent with FDA regulations for declaring sugar content, which require that sugar be rounded to the nearest gram ("the FDA rounding rules").  *See id.* ¶ 23; 21 C.F.R. § 101.9(c)(6)(ii).

49.     Next, because Chobani's Gimmies™ Milkshakes are sold in 4 fluid ounce containers, not 3.1 fluid ounce containers like Danimals Smoothies, Chobani selected a common volume for the comparison—4.0 fluid ounces.  (Sandfort Direct ¶ 22.)  Calibrating the volume to a different net weight could be misleading to consumers, as it could have implied that the net weight of Gimmies™ Milkshakes is something *other than* 4 fluid ounces.

50.     Chobani was required by applicable regulations to calculate an "apples to apples" comparison, by looking at nutrient contents in equal volumes of the products compared.  *See* FTC Food Advertising Guidance.

51.     By comparison, 4.0 fluid ounces of Chobani's Gimmies™ Milkshakes yogurts at that time contained an average of 8.3333 grams of sugar (taking into account that one flavor has 7 grams and two have 9 grams), which rounds to 8 grams consistent with the FDA rounding rules.  (Sandfort Direct ¶ 25.)

52.     Accordingly, there are 4 grams more sugar in 4 fluid ounces of Dannon's Danimals than in the same 4 fluid ounces of Chobani's Gimmies™ Milkshakes.  And that 4 gram difference is 33%.  (*Id.* ¶ 26.)

53.     Stated differently, 1 fluid ounce of Chobani's Gimmies™ Milkshakes contains,

on average, 2 grams of sugar compared to 3 grams of sugar per fluid ounce in Dannon's

Danimals.  Again, that difference is 33%.  (*Id.* ¶ 27.)

54.     If Chobani and Dannon sold their products in one fluid ounce containers, all

Gimmies™ Milkshakes (even those which formerly contained 9 grams of sugar in 4 fluid

ounces) would have 2 grams of sugar on the Nutrition Facts panel, and all Danimals Smoothies

(regardless of whether they had 9 or 10 grams of sugar per 3.1 fluid ounces) would have 3 grams

of sugar on the Nutrition Facts panel, per the FDA rounding rules.  Again, the calculation leads

to a 33% difference between equal volumes of the two product platforms.  (*Id.* ¶ 28.)

55.     As discussed below, however, because Chobani has reformulated the Bizzy Buzzy

Strawberry and the Cookies & Cream Crush flavors of Gimmies™ Milkshakes, and they now

contain 8 grams of sugar per 4 fluid ounces, Chobani can continue to make the 33% less sugar

claim, without averaging across its own product line, or rounding the sugar content to the nearest

gram for either its products or Dannon's products (despite that such methods are allowable under

applicable food labeling regulations and otherwise not misleading to consumers).  This claim is

based on averaging the sugar content in all eight flavors of Danimals® Smoothies (*i.e.*, the three

flavors with 10 grams of sugar per 3.1 fluid ounces and the five flavors with 9 grams of sugar per

3.1 fluid ounces) based on the availability of these products in stores and the reported sugar

content in industry databases, such as Mintel.

**E.     Chobani Has Reformulated Two Flavors of the Gimmies™ Milkshakes and Is Revising Its Advertising and Labeling Accordingly.**

56.     Chobani is always seeking to improve its products to fulfill its mission of

providing better food to more people.  (Sandfort Direct ¶ 43.)

57.     In part because of that philosophy on food and product optimization, Chobani has

reduced the sugar content in the two flavors of Gimmies™ Milkshakes at issue in this case, the

Bizzy Buzzy Strawberry and the Cookies & Cream Crush, so that these two flavors will contain 8 grams of sugar per each 4.0 fluid ounce container, down from 9 grams in the original formulation.  (*Id*.)

58.     Chobani began production of these flavors with the new recipes on January 9, 2019.  (*Id*.)[2]

59.     In connection with this change in recipe and reduction in sugar, Chobani has designed, ordered, and printed new paperboard overwrap labels for the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes, making the claim on the front of the label that these flavors contain "30% less sugar than the leading kids' drinkable yogurt" as calculated on a ***per fluid ounce*** basis.  (*Id*. ¶ 44; DX-016.)

60.     Directly to the left of this "30% less" claim on the front of the label is a disclosure stating "Chobani Gimmies™ Milkshakes:  2g sugar per fl oz; leading kids' drinkable yogurt: 2.9g sugar per fl oz."  (Sandfort Direct ¶ 45; DX-016.)

61.     The new labels bearing the "30% claim" and per fluid ounce disclosure (which appears directly next to the claim on the front of pack) have been designed and ordered, and will be ready for production on or around February 10, 2019.  Accordingly, after that date, Chobani will cease use of packaging bearing the challenged 33% claim, and destroy its remaining inventory of labels with that claim.  After February 10, 2019, only the new labels with the 30% claim will be used on Bizzy Buzzy Strawberry and the Cookies & Cream Crush flavored Gimmies™ Milkshakes.  (Sandfort Direct ¶ 46.)

62.     This new "30% claim" is based on the following calculation, which does not utilize averaging across Chobani products (each flavor meets the claim individually) or rounding

---

[2] The Chillin' Mint Chocolate flavored Gimmies™ Milkshakes will remain at 7 grams per 4 fluid ounces.  (Sandfort Direct ¶ 51.)

to the nearest gram—even though both are permissible.  For the reformulated Bizzy Buzzy

Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes, there are 2 grams of

sugar per fluid ounce.  The 30% claim calculation does ***not*** take into account the fact that certain

Danimals flavors currently for sale still contain 10 grams of sugar; instead, it accepts as true

Dannon's representation that those flavors will *eventually* contain 9 grams of sugar per 3.1 fluid

ounces, which equals 2.9 grams of sugar per ounce in those products.  Accordingly, the

reformulated Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™

Milkshakes will compare their 2 grams of sugar per fluid ounce with the Danimals 2.9 grams of

sugar per fluid ounce, which is 31% less sugar per ounce.  Chobani will conservatively make a

30% claim on its labels.  (*Id*. ¶ 47.)

63.     Chobani has already changed all digital marketing materials under its control,

including its website and social media accounts, to remove the 33% claim in connection with

these flavors and will cease printing other marketing materials with this claim.  (*Id*. ¶ 48.)

64.     Chobani anticipates the new labels with the "30% claim" will be put into

production for the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavors of Gimmies<sup>TM</sup>

Milkshakes (which now contain 8 grams of sugar per 4.0 fluid ounces) on February 10, 2019.

(*Id*. ¶ 49.)

65.     Over the next ten weeks from that date, the current packaging for those two

flavors already in market will diminish from store shelves—they will either sell through to

consumers or reach their expiration date, and those products that sell through or expire will be

replenished by the new Gimmies™ products, with the new recipe and new labels bearing the

"30% less" claim.  (*Id*.)

66.     During the interim period when the reduced sugar product is in the bottles but before the new labels with the 30% claim are delivered to retailers, the "33% claim" will still be true, because with the reduced sugar, Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes will each contain 2 grams of sugar per fluid ounce (without averaging across all Gimmies™ Milkshakes flavors), and the average amount of sugar across Dannon's Danimals Smoothies is 9.375 grams per 3.1 fluid ounces, or 3.02 grams of sugar per fluid ounce.  (*Id*. ¶ 50.)

67.     Once the reformulated Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes are on the market, they will contain *at least* 30% less sugar by volume than Dannon's Danimals Smoothies under any possible calculation.

**F.      Chobani Will Suffer Serious Harm if a Preliminary Injunction Issues**

68.     To ensure that there is adequate supply to meet the anticipated demand for the Gimmies™ Milkshakes, Chobani must continue production of inventory and manage its on-hand supply of packaging materials and ingredients.  (*Id*. ¶ 30.)

69.     The Gimmies™ Milkshakes are perishable dairy products with a very short shelf life, and must be stored in refrigerated warehouses and transported on refrigerated trucks for distribution to retail locations.  (*Id*. ¶ 31.)

70.     Chobani currently has over 28,000 cases of Gimmies™ Milkshakes—consisting of approximately 675,000 bottles of product—on hand in its manufacturing facility, or awaiting distribution.  (*Id*. ¶ 32).

71.     Currently, there are over 91,300 cases of product in market, consisting of approximately 2.2 million bottles of product.  (*Id*.)

72.     In addition, Chobani has on hand approximately 1.3 million units of Gimmies™ Milkshakes paperboard overwrap labels with the 33% claim printed to fill orders as they come in.  (*Id*. ¶ 33.)

73.     If Chobani was forced to stop shipments of its Gimmies™ Milkshakes and withdraw product from retail shelves, over 2.8 million bottles of finished yogurt products—otherwise completely safe for consumption—***would need to be destroyed***.  Gimmies™ Milkshakes are perishable yogurt products with a short shelf life, so even the "finished goods" Chobani has on hand would go to waste, as those products will expire before new labeling is available to put into production.  (*Id*. ¶ 34.)

74.     Not only would Chobani need to destroy those "finished goods" and inventory of overwraps but some of the component ingredients Chobani has on hand for use in Gimmies™ Milkshakes would expire while new packaging is printed, adding to the waste of good food and cost to Chobani.  (*Id*. ¶ 35.)

75.     If Chobani is forced to pull products from nationwide retail stores and cold storage warehouses, and orchestrate their destruction, Chobani estimates the total cost of labor and logistics alone would be in the ***millions***, not counting the additional cost of the destroyed ingredients and finished yogurt products.  (*Id*. ¶ 36.)

76.     Additionally, Chobani would suffer millions of dollars in lost sales per month—both for orders that have already been placed of Gimmies™ Milkshakes, and for anticipated sales during the time period in between the time when the products are not on store shelves and when Chobani could reprint new packaging to replenish the supply of Gimmies™ Milkshakes. The time between deciding to make a change to product labels, and having the labels in hand and ready to be put into production, is approximately two months.  (*Id*. ¶ 37.)

77.     If Chobani was forced to pull the challenged Gimmies™ Milkshakes from the shelves or stop or otherwise withhold shipments of those products from its manufacturing facility, its retailers may also pull or refuse to stock the twelve other Gimmies™ products (*i.e.*, the different flavors of Gimmies™ "crunch" and "tubes" products).  (*Id*. ¶ 38.)

78.     Similarly, if consumers no longer see Chobani's Gimmies™ products on store shelves, or otherwise hear or read that the product has been withdrawn or otherwise withheld from shelves, they are likely to assume that there was a consumer safety issue, even though these products are perfectly safe, good food.  The damage to Chobani's brand would be irreparable. (*Id*. ¶ 39.)

79.     Further, retailers will not hold shelf space for Chobani's yogurt products if they are withdrawn from shelf or otherwise unavailable as a result of any order to cease shipping Gimmies™ Milkshakes during the period of time that it will take to change packaging and replenish the retailers' shelves.  Chobani's failure to provide retailers product on a timely basis will irreparably harm Chobani's relationships with its retail customers.  (*Id*. ¶ 40.)

80.     Moreover, Chobani would lose some of the costs it incurred to introduce the new items on shelf (known in the industry as "slotting fees"), which was in the millions of dollars. Additionally, legacy products with proven consumer loyalty may have resiliency to short-term market absences, but for newly launched products like Gimmies™ Milkshakes, it could be fatal. (*Id*.)

### G.     Procedural History

81.     Dannon initiated this action on December 14, 2018 by filing a complaint with an *ex parte* order to show cause and an application for a temporary restraining order.  (ECF Nos. 1, 3.)

16

82.    The Court held a hearing on December 19, 2018 on Dannon's application for a temporary restraining order and denied the application from the bench.  (*See* Dec. 19, 2018 Hr'g Tr. 2:19-21.)

83.    At the December 19 hearing, counsel for Chobani represented that it was prepared to make changes to the labeling of its Gimmies™ Milkshakes and the Court urged the parties to speak about a possible resolution of this matter.  (*Id*. 8:13-15.)  As represented, Chobani has now made those changes.

## PROPOSED CONCLUSIONS OF LAW

### I.    LEGAL STANDARDS

#### A.    Allowable Advertising Under Applicable Food Laws and Regulations

84.    The Federal Trade Commission ("FTC"), United States Food & Drug Administration ("FDA") and United States Department of Agriculture ("USDA") "share jurisdiction over claims made by manufacturers of food products pursuant to a regulatory scheme established by Congress through complementary statutes."  *See* FTC Food Advertising Guidance.  "Since 1954, the FTC and the FDA have operated under a Memorandum of Understanding, under which the Commission has assumed primary responsibility for regulating food advertising, while FDA has taken primary responsibility for regulating food labeling."  (*Id*.)

85.    FDA regulations require foods to bear a Nutrition Facts panel, which must list "all nutrient and food component quantities" in the food on a per serving basis.  *See* 21 C.F.R. § 101.9(b).

86.    And when listing the sugar content on a nutrition label—*i.e.*, the "values declared in the nutrition labeling"—manufacturers must round the quantity of sugar to the nearest gram. *See id.* § 101.9(c)(6)(ii) (requiring that total sugar value on the Nutrition Label be rounded to the nearest gram if the total sugar content per serving is greater than 1 gram).

17

87.     For each type of food, the FDA determines a "reference amount customarily consumed per eating occasion" (RACC) as the basis for calculating the number of serving sizes in a product.  *See* 21 C.F.R. § 101.12.

88.     FDA regulations also "define certain absolute and comparative terms that can be used to characterize the level of a nutrient in a food."  *See* FTC Food Advertising Guidance.

89.     FDA regulations and corresponding guidance govern a relative nutrient content claim, which is a statement that "compares the level of a nutrient in the food with the level of a nutrient in a reference food" using words such as "light," "reduced," or "less."  *See* 21 C.F.R. § 101.13(j)(1); FDA, A Food Labeling Guide: Guidance for Industry (Jan. 2013), at 76-77 (available at https://bit.ly/2n097lU) ("FDA Food Labeling Guidance"),

90.     To bear a relative, or comparative, claim about the level of a nutrient, "the amount of that nutrient in the food must be compared to an amount of a nutrient in an appropriate reference food," the other food to which the food making the claim is being compared.  21 C.F.R. § 101.13(j)(1).

91.     For a claim using "less," a reference food first may be either (1) a "dissimilar food" that can be "generally substituted" for another (i.e., "potato chips as a reference for pretzels"), or (2) "a similar food" (i.e., "one brand of multivitamin [] as reference for another brand of multivitamin").  *Id.* § 101.13(j)(1)(i)(A). The reference food must "contain[] at least 25 percent less sugar per reference amount ordinarily consumed than an appropriate reference food."  *Id.* § 101.60(c)(5)(i).

92.     In addition to those requirements, a reference food must satisfy one of two provisions: the provision in 21 C.F.R. § 101.13(j)(1)(ii)(A) ["CFR Section A"], or the provision in 21 C.F.R. § 101.13(j)(1)(ii)(B) ["CFR Section B"].

93.    Under CFR Section A, the reference food shall be "representative of the type of food that includes the product that bears the claim."  21 C.F.R. § 101.13(j)(1)(ii)(A).

94.    Under CFR Section A, the nutrient value used for the reference food shall be "representative" of that type of food, "e.g., a value in a representative, valid data base; an average value determined from the top three national (or regional) brands; . . . or, where its nutrient value is representative of the food type, a market leader."  *Id.*  Averaging across different flavors of "a market leader" is necessary to ensure that the nutrient value used is "representative of the food type."  *Id.*  If a manufacturer uses values from a "representative, valid data base," the regulation does not require a manufacturer to independently validate that data.

95.    Under the distinct CFR Section B, the reference food shall be the food "of another manufacturer" that has been regularly offered for sale for a substantial period of time.  *Id.* § 101.13(j)(1)(ii)(B).

96.    Under CFR Section B, the "nutrient values used to determine the claim . . . shall be either the values declared in nutrition labeling or the actual nutrient values."  *Id.*  Either type of value is permissible, "provided that the resulting label is internally consistent" by using the same type of value on each product.  *Id.*  The claim must also "not cause consumer confusion."  *Id.*

97.    In addition, the FTC not only recommends, but **requires** that advertisers "make clear the basis for [a] comparison" between foods by, among other things, use of a "common standard of measurement."  *See* FTC Food Advertising Guidance.  That is, **any comparative nutrient claim must be based on an "apples-to-apples" comparison of the amount of a nutrient in a product by volume**.

19

98.     FDA regulations expressly contemplate that a manufacturer may use nutrient values from a database to form the basis for a comparison.   *See* 21 C.F.R. § 101.13(j)(1)(ii)(A) (a nutrient value may be "a value in a representative, valid data base").  Those regulations do not require a manufacturer to independently validate that data.

### B.      Section 43(a) of the Lanham Act

99.     Dannon asserts a claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  (Compl. ¶¶ 63-70.)

100.     "To establish false advertising under Section 43(a) of the Lanham Act . . . the plaintiff must first demonstrate that the statement in the challenged advertisement is false" either "by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (citations and quotations omitted).

101.     Further, "the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product . . . that the defendant placed the false or misleading statement in interstate commerce . . . and that the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Id*. (citations and quotations omitted).

### C.      New York General Business Law § 349

102.     Dannon also asserts a claim for false advertising under New York General Business Law ("GBL") § 349.  (Compl. ¶¶ 71-75.)

103.     To prevail on a Section 349 claim, "a claimant must allege that: (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *See Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003) (citations and quotations omitted).

104.     Claims under Section 349 involve similar elements as claims under Section 43(a) of the Lanham Act.  *See P&G v. Chesebrough-Pond's, Inc.*, 588 F. Supp. 1082, 1083 n.4 (S.D.N.Y. 1984), *aff'd*, 747 F.2d 114 (2d Cir. 1984).

105.     "However, when a competitor raises a § 349 claim, it is clear that the gravamen of the complaint must be consumer injury or harm to the public interest."  *See Gucci*, 277 F. Supp. 2d at 273 (citations and quotations omitted).

### D.     Preliminary Injunctions

106.     "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

107.     Because "[a] preliminary injunction is "'one of the most drastic tools in the arsenal of judicial remedies'" [. . .] courts have cautioned that it should be 'used with great care.'"  *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 509 (S.D.N.Y. 2017) (quoting *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)))

108.     Accordingly, a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *C.D.S., Inc. v. Zetler*, 217 F. Supp. 3d 713, 716 (S.D.N.Y. 2016) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

109.     "In this Circuit a preliminary injunction . . . will be granted if the moving party shows that he will suffer irreparable harm absent injunctive relief and either (1) that he is likely to succeed on the merits of his claim; or (2) that there are sufficiently serious questions going to the merits to make them fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party."  *Tang Capital Partners, LP v. Cell Therapeutics, Inc.*, 591 F. Supp. 2d 666, 670 (S.D.N.Y. 2008) (McMahon, J.) (quotations omitted).

21

## II.   DANNON FACES NO ACTUAL OR THREAT OF IRREPARABLE INJURY WITH CHOBANI'S EXISTING OR REFORMULATED GIMMIES™ MILKSHAKES.

110.   Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *AIM Int'l Trading LLC v. Valcucine SpA,* 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002) (citations omitted).

111.   To establish irreparable harm, the movant must demonstrate "'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of monetary damages." *Estrella v. Menifee*, No. 02 Civ. 6114, 2003 U.S. Dist. LEXIS 1134, at *8 (S.D.N.Y. Jan. 24, 2003) (citation omitted).  In addition, "[t]he Second Circuit has articulated the 'general proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.'" *P&G v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 353 (S.D.N.Y. 2008) (quoting *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995)).

### A.   Monetary Damages Can Remedy Dannon's Alleged Injury (If Any).

112.   Dannon asserts, without alleging facts, that "Chobani's false advertising has damaged (and unless it is enjoined, will continue to damage) the goodwill associated with the Danimals® brand . . . and injure Dannon's ability to recruit new customers and retain existing customers."  (See, e.g., Compl. ¶¶ 61, 62; Pl.'s MOL at 7, 11.)

113.   These speculative and conclusory allegations are plainly insufficient. *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980) ("[S]omething more than a plaintiff's mere subjective belief that [it] is injured or likely to be damaged is required before [it] will be entitled even to injunctive relief.")

114.   Furthermore, the only potential harm Dannon alleges can be remedied by monetary damages. (Def.'s Opp'n at 15-16.)

22

ny-1357705

115.     Dannon claims that the challenged statements will "injure Dannon's ability to recruit new customers and retain existing customers."  (Compl. ¶ 62; Pl.'s MOL at 7, 11.)  This is simply a claim for lost sales.

116.     Courts in the Second Circuit have repeatedly held that monetary damages are sufficient to remedy any lost sales and have declined to enter any type of preliminary injunctive relief on that basis.  *See, e.g.*, *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 277 F.3d 253, 260 (2d Cir. 2002) (affirming denial of preliminary injunction for lack of irreparable harm where allegations of irreparable harm are based on quantifiable estimates of lost profits); *Ultreo*, 574 F. Supp. 2d at 353 (denying preliminary injunction in false advertising case where the only evidence of injury was lost sales).  Dannon's attempt to obtain a preliminary injunction order fails for the same reasons.

117.     Regardless, the fact that sales of Dannon's Danimals have **increased** since the release of Gimmies™ Milkshakes further suggests that Dannon does not face any threat of irreparable harm. (Sandfort Direct ¶ 12; DX-014 (market data showing "total distribution points" and market share of Danimals  increased between December 1, 2018 and December 29, 2018)); *see, e.g.*, *NewMarkets Partners LLC v. Oppenheim*, No. 08 Civ. 4213(WHP), 2008 U.S. Dist. LEXIS 99808, at *7-9 (S.D.N.Y. Dec. 3, 2008) (denying preliminary injunction where plaintiffs failed to demonstrate causal link between the alleged false advertising and plaintiffs' own sales position); *Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F. Supp. 2d 555, 614-615 (W.D. Pa. 2013) (denying preliminary injunction after finding no irreparable harm where sales of plaintiff's product continued to increase despite entry of defendant's challenged product into the market); *Brandywine Prod. Grp. Int'l v. Univ. Distribution Ctr. LLC*, No. 2:16-cv-02248 (WJM), 2016 U.S. Dist. LEXIS 132195, at *4-9 (D.N.J. Sept. 27, 2016) (denying preliminary injunction,

finding no irreparable harm where plaintiff reported revenue growth in spite of defendant's entry into the market).

**B.    Chobani Is Reformulating the Two Flavors of the Gimmies™ Milkshakes at Issue and Changing Its Labeling, and Thus Dannon's Claim of Irreparable Injury Is Moot.**

118.    Dannon also cannot show that it faces any irreparable harm because Chobani has reformulated and begun producing the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes that have a reduction in sugar by one gram, to 8 grams of sugar per 4 fluid ounces on January 9, 2019, *the week before the hearing on Dannon's motion for a preliminary injunction*.  (Sandfort Direct ¶¶ 12, 42-50.)

119.    With this reformulation, the current labels with the 33% claim remain literally true—because the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes will each contain 2 grams of sugar per fluid ounce (without averaging with the 7 grams of sugar contained in Chillin' Mint Chocolate flavored Gimmies™ Milkshakes), and the average amount of sugar across the Dannon's Danimals Smoothies currently available in the market is 9.375 grams per 3.1 fluid ounces, or 3.02 grams of sugar per fluid ounce.  When comparing to a "market leader," as Chobani properly did under CFR Section A, FDA regulations require that the nutrient values of the market leader be "representative of the food type."  21 C.F.R. § 101.13(j)(1)(ii)(A).  Here, Chobani compared the sugar content in its products with the average amount of sugar in a reference product, Dannon's Danimals® Smoothies, three flavors of which contain 10 grams of sugar per 3.1 fluid ounces[3] and five flavors contain 9 grams of sugar per 3.1 fluid ounces.

120.    CFR Section A in the FDA regulations permits a manufacturer to compare its products to an average of multiple leading product lines.  Because a product line usually has

---

[3] S*ee* Sandfort Direct ¶¶ 19, 21.

multiple flavors, making a proper comparison to multiple product lines necessarily involves averaging the sugar content of multiple flavors. Because Chobani here was comparing to a "market leader," it similarly averaged all the flavors of Danimals to ensure that the sugar value it used was "representative of the food type." *See id.*

121.    Regardless, on February 10, 2019—*less than a month after the preliminary injunction hearing*—new labels for the reformulated flavors of Gimmies™ Milkshakes will go into production. The new labels will include a "30 % less sugar" claim based on a *per fluid ounce* comparison of the sugar content in the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavored Gimmies™ Milkshakes, on the one hand, and *assuming* that Dannon's representation that all of the flavors of Dannon's Danimals Smoothies will eventually contain 9 grams of sugar per 3.1 fluid ounces is true (despite market data showing that three flavors of Danimals contain 10 gram of sugar per 3.1 fluid ounces), that 30% claim is literally true under any calculation or regulatory interpretation. (*See* Sandfort Direct ¶ 44.)

122.    Further, Chobani *has already changed all* digital marketing materials under its control, including its website and social media accounts, to remove the 33% claim. (*Id.* ¶ 48.)[4]

123.    In other words, Dannon could not articulate irreparable harm with the existing Chobani claim, but harm, if any, is now moot in light of Chobani's good faith actions and a preliminary injunction is therefore neither necessary nor appropriate. *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 524 (S.D.N.Y. 2009) (finding that plaintiff's request for preliminary injunctive relief was moot in light of fact that ads in question were discontinued, and that defendant committed not to resume those ads during the pendency of the lawsuit, explaining

---

[4] In its Complaint, Dannon pointed out that Chobani's website unintentionally omitted the word "average" in this same statement. That mistake was corrected immediately, effective December 17, 2018 and this is thus a non-issue. (*See* Decl. of Peter McGuinness ¶ 14 (Dec. 18, 2018), ECF No. 15.)

that "SVC's fear that Coca–Cola will resume the ads is speculative at best and does not warrant a preliminary injunction in light of Coca–Cola's sworn declarations and testimony under oath that it will not resume the ads during the course of this litigation"); *Cablevision Sys. Corp. v. Verizon N.Y. Inc.*, 119 F. Supp. 3d 39, 51 (E.D.N.Y. 2015) (cessation of allegedly false advertisements rendered the question of preliminary relief as to those ads moot); *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, No. 14–CV–3685 (SJF)(SIL), 2015 U.S. Dist. LEXIS 89415, at *83-88 (E.D.N.Y. July 8, 2015) (finding that plaintiff could not establish irreparable harm under the Lanham Act because the defendants' allegedly infringing websites were no longer active and defendant represented in a sworn declaration that he would not operate the allegedly infringing websites during the pendency of the litigation); *Am. Express Travel Related Servs. Co. v. MasterCard Int'l, Inc.*, 776 F. Supp. 787, 791 (S.D.N.Y. 1991) (explaining in copyright infringement context that "[w]hen a defendant revises an allegedly infringing commercial and represents that the original commercial will not be broadcast in the future, the need for injunctive relief as to the original commercial is moot").

### C.   Dannon Cannot Establish Irreparable Harm Because the Challenged Statements Are Literally True and Not Misleading.

124.     Improper speculation about non-existent injury aside, Dannon's ***only*** basis for claiming irreparable harm is that the challenged statements are "literally false."  (*See, e.g.* Compl. ¶ 32.)  But Dannon cannot establish any harm based on their claim that the 33% claim and disclosures on the Gimmies™ Milkshakes are "literally false" because the statements are true.[5]

---

[5] Dannon also cannot claim any irreparable harm based on the second and third allegedly "false" statements that only appear in disclosures on the rear label of Gimmies™ Milkshakes—disclosures that Dannon argues consumers are unlikely to read.  (*See* PX-29, Steckel Expert Report.)

125.     It is literally true that Danimals® contain 33% more sugar by volume than the Gimmies™ Milkshakes based on the calculation that Chobani discloses in the footnotes on its labels, which are consistent with FTC and FDA guidance.  (Sandfort Direct ¶¶ 24-26; DX-013.)

126.     The FTC requires that advertisers "make clear the basis for [a] comparison" between foods by, among other things, use of a "common standard of measurement."  *See* FTC Food Advertising Guidance.

127.     Chobani accurately calculated the 33% claim by comparing the average sugar content in equivalent volumes of product, *i.e.* a common standard of measurement, as it was required to do.  That calculation resulted in finding that Danimals® Smoothies contain, on average, 9.375 grams of sugar per 3.1 fluid ounces (3.02 grams of sugar per fluid ounce), which is the equivalent of 12 grams of sugar (rounded down from 12.08) per 4 fluid ounces.  And that is 33% more sugar than the average of 8 grams of sugar (rounded down from 8.33 grams) in per 4 fluid ounces in Gimmies™ Milkshakes.  Rounding to the nearest gram is contemplated by FDA regulations for nutrition labeling.  *See* 21 C.F.R. § 101.9(c)(6)(ii).

128.     Dannon has pointed to no law or valid evidence in support of its argument that FTC and FDA rules prohibit the methodology employed by Chobani to derive the 33% claim.

129.     Dannon's claim that the 33% claim should be evaluated based solely on the sugar content in the Bizzy Buzzy Strawberry and Cookies & Cream Crush flavors (9 grams per 4 fluid ounces)—ignoring the difference in volume of the two products— and Dannon's claim that all flavors of Danimals contain 9 grams of sugar are both unavailing.  Dannon's argument completely ignores the disclosure on the Gimmies™ Milkshakes making clear to consumers that the comparison is based on the ***average*** amount of sugar in the Gimmies™ Milkshakes and the ***average*** amount of sugar in the "leading kids' drinkable yogurt."  Chobani discloses that

27

Gimmies™ Milkshakes—including all three flavors—have an average of 8 grams of sugar.[6]

Although the actual average is 8.33 grams, Chobani rounded down consistent with FDA

regulations and, regardless, rounding down had an immaterial effect on the calculation.

Similarly, the disclosures make clear that the "leading kids' drinkable yogurt" contains, on

average, 12 grams of sugar.  That is based on calculating the average sugar content per ounce in

Danimals—including the three flavors with 10 grams of sugar per 3.1 fluid ounces still available

in retail stores—multiplying that by 4 to create an "apples-to-apples" volume comparison with

Gimmies™ Milkshakes, and then ***rounding down*** to 12 grams.  (Sandfort Direct ¶ 24.)

130.    In addition, when Chobani developed the 33% claim, three flavors of Danimals

contained 10 grams of sugar per 3.1 fluid ounces and ***all three flavors are still available at retail***

***locations with 10 grams of sugar***.  (DX-001, 012-14.)  Dannon cannot attempt to hold Chobani

liable under the Lanham Act—much less obtain a preliminary injunction—based on its claim

that all flavors of Danimals contain 9 grams (or that Dannon is in the process of changing to 9

grams) of sugar despite the market evidence to the contrary.

131.    Further, Dannon is incorrect that Chobani advertises the Gimmies™ Milkshakes

as "contain[ing] 8g of sugar per 4 ounces."  (Compl. ¶ 6.)  Chobani accurately represents the

sugar content in the "Nutrition Facts" on the rear label of Gimmies™ Milkshakes.  (*See, e.g.*, *id.*,

Ex. B.)  The only place that Chobani references 8 grams of sugar on the labels is a back of the

label footnote substantiating the "33% less sugar claim," which unequivocally states that the

Gimmies™ Milkshakes platform contains an ***average*** of 8 grams of sugar per 4 fluid ounces. (*Id.*

¶ 38.)

---

[6] Further, the actual sugar content in each flavor of Gimmies™ Milkshakes is accurately
represented on the Nutrition Facts panel.  (DX-015; DX-016.)

132.     Further, Chobani does not state that Danimals® Smoothies are sold in a "4 oz. serving size."  Chobani never mentions Danimals® on the Gimmies™ Milkshakes labels or advertising.  (DX-015.)  And Chobani truthfully states in a footnote disclosure substantiating the 33% claim that the "leading kids' drinkable yogurt" contains "avg. 12 g sugar per 4 fl oz serving".  (*Id*.)  Directly underneath this footnote is another footnote that correctly states that the "leading kids' drinkable yogurt" is sold in "net 3.1 fl. oz." serving sizes.  (*Id*.)

133.     By contrast, Dannon is advocating that nutrient labeling claims be made by serving size, ***regardless of whether the products being compared are actually the same serving size.***  By this logic, however, a manufacturer could produce a kids' drinkable yogurt that contains 4.5 grams of sugar in 1.55 fluid ounces, exactly half the 9 grams of sugar per 3.1 fluid ounce serving as certain flavors of Danimals® Smoothies.  This manufacturer then could claim that its product has "50% less sugar" than Danimals® Smoothies ***even though it has the exact same sugar content by volume***.  This would be counter to standard industry practices (*see, e.g.*, DX-017) and misleading to consumers.

134.     Moreover, all of the challenged statements also "cannot be literally false" because they are potentially "susceptible to more than one reasonable interpretation"—whether it is more accurate to compare the amount of sugar by volume, as Chobani did, or to compare the total sugar content in two products of different volumes, as Dannon does in its moving papers.  (*See, e.g.*, Compl. ¶ 43); *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("[O]nly an unambiguous message can be literally false.  Therefore, if the language or

29

graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.") (citations and quotations omitted).[7]

135.    Because none of the statements that Dannon is challenging are literally false (indeed they are literally true), Dannon cannot obtain a preliminary injunction without any facts suggesting consumer confusion or deception—which Dannon has failed to adduce because, as set forth below, its only evidence comes from a purported expert that conducted a survey which is fatally flawed and entirely irrelevant.  *See, e.g.*, *Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470, 477-480 (S.D.N.Y. 2012) (denying preliminary injunction because "when the evidence shows that the label claims are literally true, the plaintiffs are not likely to demonstrate that [defendant] violated the Lanham Act"); *NewMarkets Partners*, 2008 U.S. Dist. LEXIS 99808, at *8-9 (finding no presumption of irreparable harm where advertising was not facially false); *Stokely-Van Camp*, 646 F. Supp. 2d at 529-531 (denying preliminary injunction in false comparative advertising case where sports drink manufacturer failed to establish likelihood of irreparable injury absent preliminary injunction, because it failed to show that any of defendant's ads necessarily implied a comparison to plaintiff's product); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, No. 01 Civ. 2775, 2001 U.S. Dist. LEXIS 7061, at *19 (S.D.N.Y. June 1, 2001) (denying preliminary injunction for lack of extrinsic evidence showing that advertising was misleading).

136.    Finally, Dannon has not challenged and would have no grounds to challenge the labeling on the reformulated Gimmies™ Milkshakes because Chobani's claim that the reformulated flavors of Gimmies™ Milkshakes contain 30% less sugar than the leading kids'

---

[7] Even if Dannon's expert's consumer survey was valid—and, as set forth below, it is not—the results suggest that, at best, the 25% less fat claim in the hypothetical survey question was "susceptible to more than one reasonable interpretation" and therefore not literally false.

drinkable yogurt brand (*i.e.,* Danimals Smoothies) is literally true, under any calculation—each of the three flavors meets the claim individually, without rounding.

> **D.    Dannon's Purported Expert Report and Consumer Survey Are Inadmissible, Should be Given no Weight, and Provide No Evidence of Confusion.**

137.    Dannon's only purported "evidence" of an alleged "indication" of consumer confusion is the testimony and report of Dr. Joel Steckel, which this court should exclude or give little, if any, weight.

138.    Dr. Steckel purports to have conducted a consumer survey between December 20, 2018 and December 25, 2018, which did ***not*** ask questions about the actual drinkable yogurt products at issue or the actual claims that are being contested, including the footnote disclosures, or the actual packaging of the Gimmies™ Milkshakes, which was available to Dr. Steckel when he devised the survey.  (PX-29, Steckel Expert Report ¶ 10.)  Instead of testing the actual yogurt products, claims, or packaging at issue here, Dr. Steckel asked survey respondents questions about two hypothetical ***ice cream*** manufacturers, one of which represents that its ice cream, sold in a four ounce container, has "25% less fat than" the other company's ice cream, which is sold in 3.5 ounce containers.  (*See id*. ¶ 26.)  Dr. Steckel's survey failed to include any of the disclosures regarding the claim that are at issue here.  Indeed, Steckel did not even survey ***whether*** consumers would even notice and attend to the claim and instead just ***assumed*** that all consumers would notice the claim and ignore the disclosures.  (*See id*. ¶¶ 32, 35.)

139.    Unsurprisingly, Dr. Steckel readily admitted that his "survey" is of limited value in evaluating how consumers would interpret the actual claims on the actual products at issue here:

> Importantly, ***this study does not completely reflect how potential purchasers of Chobani's Gimmies milkshakes would see the "33% less sugar than leading kids' drinkable yogurt" claim displayed on the packaging of the Chobani's milkshake products***.

(Steckel Report ¶ 16 (emphasis added).)

140.    Under the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the criteria for evaluating the admissibility of expert testimony are: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community.  *See* 509 U.S. 579, 580 (1993).  Dr. Steckel's survey fails this test.

141.    "Survey results are useful and have 'evidentiary value' if the surveys are properly designed and objectively and fairly conducted—for example, they employ 'filters' to screen out individuals whose responses may distort the results; the questions are directed to 'the real issues'" and the questions are not leading or suggestive."  *Ultreo*, 574 F. Supp. 2d at 345-346.

142.    "In determining the evidentiary value of a survey, courts examine whether: (1) universe was properly defined; (2) representative sample of that universe was selected; (3) questions to be asked of interviewees were framed in clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of litigation or purpose for which survey was conducted; (5) data gathered was accurately reported; (6) data was analyzed in accordance with accepted statistical principles; and (7) objectivity of entire process was assured."  *Id.* at 350 (internal citations omitted).

143.    Like Dr. Steckel's survey here, "[a] survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007);

(*see also* Pittaoulis Direct[8] ¶ 15 (citing G. Kip. Edwards, "The *Daubert* Revolution and Lanham

Act Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 329-

362 at 346-348 (Shari Seidman Diamond & Jerre B. Swann, eds., 2012) ("[T]he failure to

simulate marketplace conditions is a frequent basis for a *Daubert* challenge")).

144.    Courts have repeatedly rejected consumer surveys in Lanham Act cases where the

survey "failed to replicate actual marketplace conditions."  *THOIP v. Walt Disney Co.*, 788 F.

Supp. 2d 168, 178-181 (S.D.N.Y. 2011) (rejecting consumer survey that depicted products as

being sold side-by-side where there was no evidence that the products had been sold side-by-side

or would be in the future); *see also Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 166, 179

(S.D.N.Y. 2012) (finding that consumer survey inadmissible because "[t]he failure of a survey to

approximate actual marketplace conditions can provide grounds for inadmissibility"); *Malletier*,

525 F. Supp. 2d at 591 (excluding consumer survey for failure to tes "how the marks are viewed

by consumers in real life"); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ.7203(DLC),

2006 U.S. Dist. LEXIS 20787, at *77-78 (S.D.N.Y. Apr. 19, 2006) (consumer survey had "no

value on the issue of actual confusion" because "the survey did not replicate the marketplace

conditions in which consumers encounter Lancôme's products", and explaining that "the closer

the survey methods mirror the situation in which the ordinary person would encounter the

trademark, the greater the evidentiary weight of the survey results.") (internal citations omitted);

*WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474-475 (S.D.N.Y. 2002) (finding

plaintiff's expert's survey was irrelevant because it "did not use pictures or advertisements that

approximate what a potential customer would encounter…"); *Trouble v. Wet Seal, Inc.*, 179 F.

Supp. 2d 291, 308 (S.D.N.Y. 2001) (declining to admit consumer survey results where the

---

[8] "Pittaoulis Direct" refers to the Affidavit of Melissa Pittaoulis, Ph.D., dated January 10, 2019.

ny-1357705

prejudicial effect of the survey strongly outweighed its probative value due to survey's failure to replicate market conditions, noting that "[a]lthough no survey can construct a perfect replica of "real world" buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions"); *ComponentOne, L.L.C. v. ComponentArt, Inc.*, No. 02:05cv1122, 2008 U.S. Dist. LEXIS 87066, at *79 (W.D. Penn. Oct. 27, 2008) (finding that plaintiffs' survey failed to generate a genuine issue of material fact as to actual confusion because the "survey's stimuli did not replicate the parties' marks as they would be encountered in any of these situations in which a potential purchaser would encounter the parties' products or services").

145.    Indeed, "[Dr.] Steckel has criticized other confusion surveys for not replicating the market."  *Hershey Co. v. Promotion in Motion, Inc.*, No. 07–cv–1601 (SDW), 2013 WL 12157828, at *17-18 (D.N.J. Jan. 18, 2013) ("[b]y all accounts, including [Dr.] Steckel's, the real world market context would influence consumers."); *see also Newport Pac. Corp. v. Moe's Sw. Grill, LLC*, No. 05-995-KI, 2006 U.S. Dist. LEXIS 74481, at *11-12 (D. Or. Sept. 28, 2006) (noting that "Dr. Steckel opines that the context in which the [consumer] survey was administered does not fairly represent real world exposure to the [trademark at issue]").

146.    As here, however, Dr. Steckel has repeatedly failed to follow his own opinion that a consumer survey should mirror real-world conditions.  In the *Hershey* case, the court concluded that a survey conducted by Dr. Steckel was "unpersuasive" because it failed to take into account "real world market context" when assessing consumers' reactions to a product.  *See, e.g.*, *Hershey*, 2013 WL 12157828, at *18.  The court decided "not [to] give [Dr.] Steckel's survey results much evidentiary weight" because the survey was based on placing the trademark

at issue on a blank white card and failed to use the actual packaging bearing the mark.  *Id*. at *17-19.

147.    Similarly, in *In re Tobacco Cases II*,  the trial court excluded Dr. Steckel's survey because, among other flaws, Dr. Steckel surveyed the wrong population based on questions about "fictional" products that "excluded attributes that many class members testified were more important than the included attributes [in the survey]."  240 Cal. App. 4th 779, 789 (2015) (affirming trial court decision).  At a hearing, the court remarked that "[r]arely have I ever seen something that was subject to such a multifaceted attack. It just demolished this survey."  *Id*. at 789 n.5.

148.    Here, Dr. Steckel's survey is even more seriously flawed.

149.    Critically, Dr. Steckel's survey did not even attempt to ask about the specific claims at issue, including the disclosure statements on the Gimmies™ Milkshakes, or even the actual products at issue.  Asking about a "25% less fat claim" on a hypothetical ice cream product (not children's drinkable yogurt or even yogurt at all) in a vacuum without any disclosure statements does not even come close to replicating real market conditions in which Gimmies™ Milkshakes are sold.  Specifically, the survey:  (a) is shown in paragraph form instead of in the context of the product packaging; (b) is not shown with other claims that may be relevant to consumers' understanding; (c) is based on the wrong product, ice cream; (d) asks about a different nutrient, fat; (e) uses 3.5 ounce serving size for the reference product, not the 3.1 ounce serving size of Dannon's Danimals; (f) makes a direct comparative claim between two specific manufacturers, rather than a claim against a "leading", unidentified competitor; (g) does not use the actual "33% less sugar claim" either on its own or in conjunction with the other prominent claim on the front label stating that the Gimmies™ Milkshakes are "20% larger" than

35

the leading kids' drinkable yogurt; and (h) ***does not include any disclosures that explain the basis for the comparative claims***, *i.e.*, the disclosures on  Gimmies™ Milkshakes that state "Chobani® Gimmies™ Milkshakes: avg. 8g sugar; leading kids' drinkable yogurt: avg. 12g sugar per 4 fl oz serving" and that "Chobani® Gimmies™ Milkshakes: net 4 fl oz; leading kids' drinkable yogurt: net 3.1 fl oz."

150.    As Chobani's expert concluded, Dr. Steckel's survey "clearly fails to replicate the market conditions in which the Chobani claim would be evaluated by consumers" and therefore "his survey tells us nothing about how Chobani Gimmies™ purchasers would interpret the "33% less sugar than leading kids' drinkable yogurt" claim and disclosure found on the product label." (*See* Pittaoulis Direct ¶¶ 15-16.)

151.    In other words, Dr. Steckel's survey has "no value" to the question of how actual consumers would respond to the claims at issue in this case and should not be considered by the Court.  *See Juicy Couture*, 2006 U.S. Dist. LEXIS 20787, at *78 (consumer survey had "no value on the issue of actual confusion" because "the survey did not replicate the marketplace conditions in which consumers encounter Lancôme's products").

152.    And there is no excuse for failing to replicate market conditions here.  That Dr. Steckel conducted his survey on a compressed timeframe neither explains nor excuses his failure to use the actual products or claims at issue.  He had access to images of the packages and the precise language of the claims as he included them in his report just, inexplicably, not in his survey.  In addition, his claim that ice cream has greater "penetration" is unavailing.  According to industry data, yogurt and ice cream have similar market penetration.  (*See* Pittaoulis Direct ¶ 48.)

153.    In addition, Dr. Steckel's consumer survey is flawed because it did not include a proper, or indeed any, control.  *See THOIP*, 788 F. Supp. 2d at 181 ("To fulfill its function, a control should 'share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed").  That flaw is "fatal."  (*See* Pittaoulis Direct ¶ 29 (quoting Bruce P. Keller, "Survey Evidence in False Advertising Cases," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 167-197 at 182 (Shari Seidman Diamond & Jerre B. Swann, eds. 2012) ("Today, most courts will reject or give little weight to surveys that have no control group to control for consumers' preexisting beliefs."); *see also Juicy Couture*, 2006 U.S. Dist. LEXIS 20787, at *80 ("[i]t is particularly remarkable that [the expert] included no control").  As Chobani's expert concluded, "[a]s a result of Dr. Steckel's failure to use a control group or control question, the results of his survey have no clear interpretation as we cannot identify the response level attributable to the tested claim versus the response level due to survey noise."  (*See* Pittaoulis Direct ¶ 30.)

154.    In addition Dr. Steckel's use of only "closed-ended" survey questions did not follow standard approaches for conducting consumer surveys.  (*See* Pittaoulis Direct ¶¶ 31-41.)  In particular, Dr. Steckel did not determine whether consumers would even notice and attend to the claim and instead assumes that all consumers would notice the claim.  (*See id*. ¶¶ 32, 35.)  As Chobani's expert concludes, "even if his survey provided a valid measure of how respondents who attend to the claim understood it—and it does not—it would still overstate the percentage of *all* consumers who were confused or misled because it fails to provide any measure of the share of respondents who notice the claim in the first place."  (*Id*. ¶ 35.)

155.    Dr. Steckel also did not survey the relevant population.  "[A] survey testing whether an advertisement is likely to mislead or deceive consumers should focus on those

consumers to whom the ad is directed (i.e., the advertiser's potential customers)."  (*See* Pittaoulis Direct ¶ 43 (quoting William Barber, "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 27-49 at 36 (Shari Seidman Diamond & Jerre B. Swann, eds. 2012).)

156.    Dr. Steckel chose to survey the general U.S. adult population.  (Steckel Report ¶ 29.)  He did not even survey ice cream purchasers to answer questions about his hypothetical ice cream products, let alone screen to include purchasers of kids' drinkable yogurt.  And, as Chobani's expert explains, Dr. Steckel "cannot generalize from a survey of the general population to kids' yogurt purchasers more generally."  (*See* Pittaoulis Direct ¶ 44.)  Indeed, "[t]he definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers."  (*Id*. (quoting Shari S. Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* 361-423 at 377, Comm.on the Dev. of the 3d Ed. of the Reference Manual on Sci. Evid. (2011)).)  Here, the general U.S. population does not indicate how consumers of kids drinkable yogurts would understand the claims and disclosures on the Gimmies™ Milkshakes label and even if

157.    Courts have excluded Dr. Steckel's surveys in the past for failing to survey the wrong population and the same result is warranted here.  *See In re Tobacco Cases II*, 240 Cal. App. 4th at 789 (trial court excluded Dr. Steckel's survey because, among other things, it surveyed the wrong population); *Medisim Ltd.*, 861 F. Supp. 2d at 166 (consumer survey inadmissible because expert "surveyed the wrong universe of respondents"); *see Juicy Couture*, 2006 U.S. Dist. LEXIS 20787, at *79-80 (finding methodological problems were "exacerbated by the choice of the universe of respondents" that did not "mirror[] [defendant's] customers generally or even the purchasers of [plaintiffs' products]"); Bruce P. Keller *et al*., Surveys in

38

False Advertising Cases, 624 PLI/Pat 351, 368-69 (2000) ("The demographics of [a] sample population must closely approximate those of the universe. If not, it will be difficult to persuade a judge that the responses of the sample can be projected to the relevant population at large. . . ).

158.     Finally, Dr. Steckel does not even purport to reach any conclusions based on his flawed survey.  Rather, Dr. Steckel states only that the survey results provide an "indication" that that there may be some consumer confusion.  An "indication" is not sufficient to demonstrate that Dannon has suffered any harm, let alone any irreparable harm for purposes of the extraordinary relief sought here.  Regardless, because of the numerous flaws in the design of Dr. Steckel's survey, it provides no value to the issues here.

159.     Similarly, Dr. Steckel's academic literature review is irrelevant and unpersuasive. Dr. Steckel does not take into account, to the contrary it ignores, the myriad regulations governing how food labeling claims must be made, including that the FDA ***requires*** that comparative nutrient claims must include disclosures and explicitly permits that disclosures be placed, as here, next to the Nutrition Facts.  *See, e.g.*, 21 C.F.R. § 101.13(j)(2)(iv)(B).  And it does not take into account the fact that consumers are the target of numerous educational efforts about food labels and the information displayed on and around the Nutrition Facts panel.  *See, e.g.* https://www.fda.gov/downloads/Food/LabelingNutrition/UCM410497.pdf.

160.     Further, the literature that Dr. Steckel cites largely concerns other products not at issue here.  (*See* Pittaoulis Direct ¶ 53.)  The only study Dr. Steckel cites concerning labeling within the yogurt industry was based on a survey with only 24 respondents and is therefore unreliable, but even if it was, that study noted that "consumer attention to nutrition labels depends on the label size, location on the packaging, and color scheme"—all labeling features that Dr. Steckel ***did not account for*** in his consumer survey.  (*See* Pittaoulis Direct ¶ 54.)  And

other studies that Dr. Steckel cite confirm that context is key when evaluating a food label.  (*Id.* ¶¶ 55-56.)  That is, the few relevant studies that Dr. Steckel does cite confirm that his consumer survey was fatally flawed and has no evidentiary value.[9]  And Dr. Steckel's review of academic literature is no substitute for an actual survey designed to assess whether consumers read or attend to the particular disclosure at issue.  (*Id.* ¶ 52.)  Dr. Steckel easily could have conducted such a survey—and tested the exact disclosure at issue here—but did not do so and relied on bald and unsupported assumptions instead.

## III.   DANNON IS UNLIKELY TO PREVAIL ON THE MERITS OF ITS LANHAM ACT CLAIM.

161.    Dannon asserts a claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  (Compl. ¶¶ 63-70.)

162.    For the same reasons that irreparable harm cannot be shown (*see supra* Section II.C, D), Dannon cannot prevail on the merits of its Lanham Act claim because all of the challenged statements in the labeling and advertising of Chobani's Gimmies™ Milkshakes are literally true, and there is no valid evidence that consumers are at all likely to be confused or deceived.  *See Merck.*, 760 F.3d at 255 (a Lanham Act plaintiff "must first demonstrate that the statement in the challenged advertisement is false . . .  by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers.") (citations and quotations omitted).

### A.    Chobani's 33% Claim Is Not Literally False.

163.    Dannon's primary complaint is that Chobani has falsely claimed on the current labeling of the Gimmies™ Milkshakes that they contain "33% less sugar than the leading kids'

---

[9] Crediting Dr. Steckel's literature review also would lead to a strange result that Dannon surely did not intend—that consumers are unlikely to review the rear-label disclosures on Dannon's own products and that Dannon's own claims therefore may be misleading.

drinkable yogurt."  (Compl. ¶ 6; *see, e.g.*, Pl.'s MOL at 13.)

164.    Setting aside the fact that the products are being reformulated and the labeling will shortly change, the current 33% claim is true.  Equivalent volumes of the Gimmies™ Milkshake yogurts have 33% less sugar than Danimals® Smoothies yogurts.  (Sandfort Direct ¶ 24.)

165.    Further, Chobani did what is required by the FTC—it made a comparative claim using equal volumes.  *See* FTC Food Advertising Guidance (advertisers should "make clear the basis for [a] comparison" between foods by, among other things, use of a "common standard of measurement").

166.    FDA regulations allowed Chobani to choose one of two options for picking the "reference food," the food or platform against which a manufacturer makes a comparative claim.  Here, Chobani used CFR Section A, which allowed it to select Danimals, a "market leader," as the reference food.  21 C.F.R. § 101.13(j)(1)(ii)(A).  To ensure that the Danimals sugar value was "representative of the food type," as required by this Section, Chobani averaged across Dannon's product line to make the claim.  *Id.*  This average sugar value did not come to a whole number.  Consistent with FDA guidance that sugar quantities on the Nutrition Panel be rounded to the nearest whole gram, Chobani then rounded that number to form the basis for its comparative claim. *See id.* §§ 101.9(c)(6)(ii).

167.    Although Chobani used CFR Section A, Chobani's claim also complies with Section B, which allows the reference food to be the food "of another manufacturer."  *Id.* § 101.13(j)(1)(ii)(B).  To calculate the average sugar content for the Danimals product line, Chobani used the sugar values "declared in nutrition labeling" for each Danimals flavor.  *Id.* And the ultimate claim "will not cause consumer confusion" because Chobani's quantitative

disclosure accurately explains the basis for its calculations.

168.    Because the FTC requires an "apples-to-apples" comparison, it is logical that averaging across one's own product line reduces consumer confusion and thus cannot give rise to a Lanham Act false advertising claim, especially where, as here, the methodology underlying the comparison is disclosed, as is the actual amount of sugar in each flavor.

169.    Indeed, the allegations in the Complaint demonstrate that Gimmies™ Milkshakes contain 33% less sugar than Danimals® Smoothies based on the calculation that Chobani explained in a footnote on the products.

170.    Further, it is literally true that the Gimmies™ Milkshakes platform contains an *average* of 8 grams of sugar per 4 fluid ounces, as Chobani accurately represents on its packaging.  (Compl. ¶ 38.)

171.    Similarly, Chobani never states in its advertising that Danimals® Smoothies are sold in "a 4 oz. serving size."  First, it never mentions Danimals®—only "the leading kids' drinkable yogurt," and second, it includes the calculation of sugar on a per 4 fluid ounce basis, which is what the FTC guidance requires.   (Sandfort Direct ¶ 13); *See* FTC Food Advertising Guidance.

172.    In addition, the packaging (as reproduced by Dannon in the Complaint) demonstrates that Chobani accurately states that the "leading kids' drinkable yogurt" contains "net 3.1 fl oz."  (*Id*. ¶ 15; Compl. ¶ 38.)

173.    A reasonable consumer would not read and scrutinize the first footnote and ignore the second.

174.    Accordingly, because none of the statements that Dannon is challenging on the current Gimmies™ Milkshakes labeling and advertising are literally false—and are, rather, true

statements—Dannon is unlikely to prevail on the merits. *See, e.g.*, *Pamlab*, 881 F. Supp. 2d at

477-480 (denying preliminary injunction because "when the evidence shows that the label claims

are literally true, the plaintiffs are not likely to demonstrate that [defendant] violated the Lanham

Act"); *SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 367-369 (N.D.N.Y. 2001) (denying

preliminary injunction where plaintiff in false advertising case failed to show that allegedly false

statements were untrue).

> **B.     There Is No Evidence that Consumers Are Likely to Be Misled by Chobani's Advertising.**

175.     Because none of the challenged statements are literally false, to prevail on the

merits, Dannon "must demonstrate, by extrinsic evidence, that the challenged commercials tend

to mislead or confuse consumers." *Ultreo*, 574 F. Supp. 2d at 345 (quoting *Johnson & Johnson

v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d. Cir. 1992)).

176.     Dannon did not adduce any such extrinsic evidence:  as established above,

Dannon's expert report and consumer survey are inadmissible and of no evidentiary value in any

event.  (*See supra* Section II.D.)  Even accepting Dr. Steckel's conclusions—and the Court

should not—an "indication" that an irrelevant population of consumers might be confused by a

hypothetical ice cream manufacturer's claim about fat content, without any disclaimers, does not

support a finding that Dannon is likely to succeed on the merits of the claim at

issue.  Accordingly, Dannon cannot meet its burden or prevail on its Lanham Act claims.  *See,

e.g. Stokely-Van Camp*, 646 F. Supp. 2d at 525 (denying preliminary injunction in part because

there was no consumer survey to show that the advertising was misleading as alleged).

## IV.     DANNON IS UNLIKELY TO PREVAIL ON ITS NY GBL § 349 CLAIM.

177.     Dannon asserts a second claim for relief under GBL § 349.  (Compl. ¶¶ 71-75.)

178.    Dannon is unlikely to prevail on the merits for the same reason it is unlikely to prevail on its claim under Section 43(a) of the Lanham Act. *See Chesebrough-Pond's*, 588 F. Supp. at 1083 n.4 (claims under Section 43(a) and Section 349 involve similar elements).

179.    "Corporate competitors [ . . .] have standing to bring a claim under [§ 349] so long as some harm to the public at large is at issue …." *See, e.g.*, *Gucci*, 277 F. Supp. 2d at 273 (citations and quotations omitted).

180.    Thus, in addition to the reasons set forth above, Dannon's claim under GBL § 349 cannot survive a motion to dismiss because this is a "dispute[] between competitors where the core of the claim is harm to another business as opposed to consumers," and therefore the "public harm . . . is too insubstantial to satisfy the pleading requirements of § 349." *Id*.

181.    Courts have explained that "[c]ompetitors may bring a deceptive acts and practices claim [under GBL § 349] only when it is premised on a harm to the public at large, which is generally based on potential danger to the public health or safety." *Greenlight Capital, Inc. v. GreenLight (Switz.) S.A.*, No. 04 Civ. 3136, 2005 U.S. Dist. LEXIS 2, at *23 (S.D.N.Y. Jan. 3, 2005) (internal citations omitted)).

182.    This case is entirely about competition, and does not involve any "danger to the public health or safety." *Id*.

183.    Dannon's only alleged injury is the possibility of lost sales—not harm to consumers.

184.    Accordingly, Dannon is unlikely to succeed on the merits of its GBL § 349 claim because "the gravamen of the complaint is harm to a business as opposed to the public at large, the business does not have a cognizable cause of action under § 349." *See Gucci*, 277 F. Supp. 2d at 273 (retail competitor's allegations that owner of trademark for fashion accessories

44

questioned authenticity of goods were insufficient to state claim under GBL § 349); *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294, 2015 U.S. Dist. LEXIS 111823, at *12 (S.D.N.Y. Aug. 24, 2015) (dismissing §§ 349, 350 counterclaims where claimant failed to identify harm to the public caused by alleged "false and misleading representations of fact and conduct" and finding that gravamen of complaint was harm to competitor rather than consumers); *Greenlight Capital, Inc.*, 2005 U.S. Dist. LEXIS 2, at *22 (dismissing §§349, 350 claims brought by competitor and explaining that "claims under the statute may only be brought by consumers, not by competitors…" unless a harm to public health or safety is alleged).

## V.    THE BALANCE OF EQUITIES FAVORS CHOBANI.

185.    As there is no risk to consumer safety or health and only speculative monetary injury to Dannon, weighed against the enormous costs to Chobani of the relief sought, and the potential waste of food that is safe to consume, the balance of the equities favor Chobani.

186.    By asking for a preliminary injunction order that would prevent Chobani from making the 33% claim, Dannon is in effect asking this Court for an order requiring Chobani to recall or stop distributing millions of units of Gimmies™ Milkshakes that contain the labeling at issue here at an enormous expense and waste, all before an Answer is filed and any discovery takes place.  (*See* Sandfort Direct ¶¶ 29-40.)

187.    A preliminary injunction preventing Chobani from distributing Gimmies™ Milkshakes or recalling them from store shelves would force Chobani to destroy over 2.8 million units of good food and ingredients, costing millions, plus lost sales, damaged customer relationships, and grave reputational harm before there is any ruling on the merits.  (*Id.*)[10]  This

---

[10] At hearing on Dannon's application for a temporary restraining order, Dannon's counsel represented Dannon is not seeking a recall.  (Dec. 19, 2018 Hr'g Tr. 2:9-10, 6:14-15 ("we're not asking for a recall").  But because Gimmies™ Milkshakes are perishable, even order that

would not only cost millions of dollars, but may also jeopardize Chobani's space on shelf (which is expensive and hard-earned in this competitive category), and would unfairly devastate a newly launched product.  (*Id*. ¶ 39.)

188.    This drastic result is not warranted here and would be inequitable to Chobani, especially given that the challenged statements are literally true, there is no evidence of consumer confusion, and Danimals sales have actually increased since Gimmies™ Milkshakes were introduced to the market.  *See, e.g.*, *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 445 (E.D.N.Y. 2013) (balance of hardships favored defendants where money damages were sufficient and where a recall, or even the use of stickers to conceal misleading language, would "pose serious hardship" because it would force defendants to "execute product alteration on a national scale"); *Kompan A.S. v. Park Structures, Inc.*, 890 F. Supp. 1167, 1184 (N.D.N.Y. 1995) (denying movant's request for injunctive relief in the form of recall in false advertising case as too harsh to order on an incomplete record, noting that "[a] court ordering recall must first weigh the likely burden and expense of a recall").

189.    Even if Dannon is not seeking a recall, however, the balance of equities does not favor Dannon because any alleged harm is compensable by monetary damages and notwithstanding that Chobani believes the 33% claim is accurate and not misleading, Chobani has taken the following good faith steps:  (1) Chobani ***has already changed all*** digital marketing materials under its control, including its website and social media accounts, to remove the 33% claim; (2) effective, January 9, 2019, Chobani began producing the two Gimmies™ Milkshakes at issue with reduced a reduced sugar content, 8 grams per 4.0 fluid ounce down from 9 grams to 8 grams; and (3) effective February 10, 2019, new packaging will be put into production that has

prevents distribution would require destroying otherwise good food at a substantial cost to Chobani.

ny-1357705

the new 30% claim, and permanently cease use of the all existing packaging bearing the 33% claim. *See, e.g.*, *Arch Assocs., Inc. v. Hedaya Bros., Inc.*, No. 93 Civ. 4267 (RWS), 1993 U.S. Dist. LEXIS 14791, at *15-16 (S.D.N.Y. Oct. 21, 1993) (finding that plaintiff failed to establish a balancing of equitites where the damages plaintiff alleged were compensable through a monetary award, and the defendant ceased selling the challenged quilts and had a minimum amount of challenged product on hand).

190.   Accordingly, *if* Dannon had satisfied its burden to obtain a preliminary injunction—and it has not—Dannon would be required to "demonstrate confidence in his legal position by posting bond in an amount sufficient to protect [Chobani] from loss in the event that future proceedings prove that the injunction issued wrongfully". *See, e.g.*, *Nokia Corp. v. Interdigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011) (quoting *Edgar v. MITE Corp.* 457 U.S. 624, 649, (1982) (Stevens, J., concurring in part and concurring in the judgment)); *see also* Fed. R. Civ. P. 65(c) (preliminary injunctions may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").  And that bond would need to be at least $5 million because if a preliminary injunction issues, Chobani would need to destroy otherwise safe food products, ingredients, and packaging; lose millions of dollars in sales and shelf space; and suffer potentially irreparable harm to its relationships, goodwill, and reputation with retailers and consumers.

191.   Finally, any request that the Court order corrective advertising simply is not appropriate at this stage of the proceedings because it "goes far beyond merely preserving the status quo." *See, e.g.*, *KRBL Ltd. v. Overseas Food Distribution, LLC*, No. 1602341, 2016 U.S. Dist. LEXIS 93374, at *13 (C.D. Cal. May 26, 2016) (declining to order corrective advertising at

preliminary injunction stage; stating, "That relief may be appropriate if the Court issues a permanent injunction, but goes far beyond merely preserving the status quo"); *Eli Lilly & Co. v. Arla Foods Inc.*, No. 17-C-703, 2017 WL 4570547, at *10 (E.D. Wis. June 15, 2017) ("[c]orrective advertising is more appropriately considered, if at all, after a final determination has been made"); *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 769, 814 (W.D. Tex. 2001) ("The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits. Deferring corrective advertising until the decision on the merits avoids the unnecessarily harsh and possibly confusing possibility of multiple corrective advertisements.") (internal citations omitted).

## CONCLUSION

For the reasons set forth above, Dannon's request for a preliminary injunction is denied.

48

Dated:  New York, New York                Respectfully submitted,
        January 10, 2019


                                   By:      /s/ Jamie A. Levitt
                                           Jamie A. Levitt
                                           Adam J. Hunt
                                           Morrison Foerster LLP
                                           250 West 55th Street
                                           New York, New York 10019
                                           Tel: (212) 468-8000
                                           Fax: (212) 468-7900
                                           E-mail: jlevitt@mofo.com
                                           E-mail: adamhunt@mofo.com

                                           Claudia M. Vetesi (*pro hac vice*)
                                           425 Market Street
                                           San Francisco, CA 94105-2482
                                           Tel: (415) 268-7000
                                           Fax: (415) 268-7522
                                           E-mail: cvetesi@mofo.com

                                           *Attorneys for Defendant*
                                           *Chobani, LLC*

49