**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANONE, US, LLC,

                    Plaintiff,

v.

CHOBANI, LLC

                    Defendant.

AFFIDAVIT OF MELISSA
PITTAOULIS, PH.D.

# AFFIDAVIT OF MELISSA PITTAOULIS, PH.D.

10 January 2019

# Contents

I.   Qualifications ................................................................................................2

II.  Assignment ..................................................................................................3

III. Summary of Opinions ..................................................................................3

IV.  Evaluation of Dr. Steckel's Survey ............................................................5

    A.   Dr. Steckel Does Not Replicate Market Conditions ..........................6

    B.   Dr. Steckel Does Not Include a Control Group or Control Question .............11

    C.   Dr. Steckel's Study Includes Closed-ended Questions Only and Does Not Follow the Standard Format for False Advertising Studies .........................................13

    D.   Dr. Steckel Did Not Survey the Relevant Population .....................................17

    E.   Dr. Steckel Does Not Conclude Consumers are Likely to Be Misled by Chobani Gimmies' Packaging and Claim........................................................................20

V.   Evaluation of Dr. Steckel's Literature Review .......................................21

    A.   Dr. Steckel's Literature Review Is Not a Subsitute for an Empirical Study on Whether Chobani Consumers Attend to and Understand the Disclosure .......21

MELISSA PITTAOULIS, being duly sworn, hereby deposes and says:

I submit this affidavit as my direct testimony for the preliminary injunction hearing in this case.

# I.     Qualifications

1.      I am an Associate Director at NERA Economic Consulting ("NERA") where I am a member of the Survey and Sampling practice. My business address is 1717 Arch Street, Suite 1100, Philadelphia, PA 19103. NERA was founded in 1961 and provides economic, financial, and statistical research and analysis.

2.      I earned a Ph.D. in Sociology from Temple University. My courses in graduate school focused on quantitative analysis. Among the courses I took are Research Design, Survey Research, Statistical Sampling, Social Statistics, Multivariate Statistics, and Hierarchical Linear Modeling. I have also taken "short courses" offered by the Joint Program in Survey Methodology, which is run by the University of Maryland. While I was a graduate student, I served as a teaching assistant in a graduate-level multivariate statistics class and as an instructor for undergraduate courses on statistics at Temple University.

3.      I have worked on survey and sampling projects at NERA since 2003. As part of my survey work, I design research, write questionnaires, supervise data collection, and analyze data. As part of my sampling work, I select samples and calculate sample estimates and confidence intervals. In my over fifteen years of experience, I have worked on survey and sampling projects in a wide variety of industries, including: alcoholic beverages, automobiles, beverages, beauty products, clothing apparel, computers, durable goods, electronics, financial products, insurance, mobile phones, personal care products, pharmaceuticals, snack foods, and video games. The majority of these projects have been conducted in connection with legal disputes, primarily intellectual property and consumer class action matters. I have also worked on projects involving antitrust issues and employment-related litigation.

4.      I am a member of the American Association of Public Opinion Research, the American Sociological Association, and the International Trademark Association. My curriculum vitae is attached as Exhibit A.

5.      NERA is being compensated for my services in this matter at my standard rate of $505 per hour. No part of NERA's or my compensation depends on the conclusions I reach or the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## II.      Assignment

6.      I was retained by counsel for Chobani, LLC on January 4, 2019 in the matter of *Danone US, LLC v. Chobani, LLC* to review and evaluate a report and survey by Professor Joel Steckel. I understand that Danone US, LLC ("Dannon") has submitted Dr. Steckel's report in support of its motion for a preliminary injunction, which seeks to enjoin Chobani from selling its Gimmies™ milkshakes products with packaging that includes the comparative claim "33% less sugar than leading kids' drinkable yogurt" and the disclosure that accompanies it. Dr. Steckel's assignment was: (1) "to evaluate the likelihood of consumers attending to and understanding the fine-print disclaimer, including on the back of the Gimmies milkshakes' packaging" and (2) "to opine on how consumers would likely interpret Chobani's '33% less sugar than leading kids' drinkable yogurt' claim prominently displayed on the packaging of Chobani's Gimmies milkshakes and communicated to consumers via other channels (e.g., website, social media)".[1]

7.      For the first part of his assignment, Dr. Steckel reviewed academic literature but conducted no empirical study of his own. For the second part of his assignment, he conducted an online survey. I have reviewed Dr. Steckel's report, survey materials, and supporting documentation that forms the basis of his opinions. A list of the additional documents I considered in preparing this affidavit is attached as Exhibit B.

## III.      Summary of Opinions

8.      It is my opinion that Dr. Steckel's report and survey do not provide valid, relevant, or probative information about whether or how consumers attend to and understand the Chobani Gimmies' "33% less sugar than leading kids' drinkable yogurt" claim (the "Chobani claim") or the claim's disclosure. Dr. Steckel did not conduct a study of the understanding of kids' yogurt purchasers of the Chobani claim and disclosure. Instead, he conducted an irrelevant

---

[1] Expert Report of Joel H. Steckel, Ph.D., December 31, 2018 (hereinafter "Steckel Report"), ¶14.

survey of U.S. adults and measured their understanding of a comparative claim, without any disclosure, about the fat content of two fictitious ice cream brands. Importantly, the claim he tested did not include information analogous to the information disclosed on the Chobani Gimmies' packaging. Dr. Steckel's survey contains many flaws, as discussed below, and accordingly, it is my opinion that it is inappropriate to generalize from the results of Dr. Steckel's survey to the claim and disclosure on Chobani Gimmies™ packaging.

9.      First, despite the availability of the products at issue, Dr. Steckel did not test the actual Chobani claim and disclosure at issue. The simple claim he did test—devoid of any context—is too different from the Chobani claim and disclosure for the results of his survey to be valid. In other words, his survey does not replicate the market conditions in which a Chobani Gimmies™ consumer would evaluate the claim at issue. The claim he tested differs from the actual Chobani claim and disclosure in several respects. While the actual Chobani claim and disclosure appear in the context of product packaging that includes other claims and nutritional information, Dr. Steckel's claim is presented as a paragraph of text without any product packaging, nutritional information, additional advertising claims, or disclosures. Importantly, the Chobani packaging includes another claim that emphasizes the difference in serving sizes between the Chobani Gimmies™ and Dannon Danimals, stating that Chobani Gimmies™ are "20% larger vs. leading kids' yogurt drink." The "20% larger" claim includes a disclosure noting that Danimals are sold in a 3.1 fluid ounce serving size, both that claim and disclosure are part of the context in which Chobani Gimmies™ consumers would evaluate the "33% less sugar than leading kids' drinkable yogurt" claim. But this context is not accounted for in Dr. Steckel's survey.

10.     Second, contrary to common survey practice, Dr. Steckel failed to include a control group, which could have measured any response bias due to the wording of the closed-ended questions. A control group also would have measured the response level attributable to consumers' pre-existing beliefs and guessing.

11.     Third, Dr. Steckel's questionnaire consisted solely of closed-ended questions and does not follow standard and court-accepted approaches for measuring consumers' perceptions of advertising claims. Consumer perception studies used in false advertising cases usually

measure whether consumers notice and attend to the advertising claim at issue as part of the analysis of whether the advertisement or product packaging confuses or deceives consumers. Dr. Steckel did not attempt to determine whether consumers would notice the Chobani Gimmies' "33% less sugar than leading kids' drinkable yogurt" claim and disclosure. Instead, he assumed all consumers would attend to such a claim (and that none would notice the disclosure information concerning the sugar content) and then used closed-ended questions alone to determine how respondents understood the claim.

12.     Fourth, Dr. Steckel did not conduct his survey among members of the relevant population, i.e., kids' yogurt purchasers, and his survey does not allow the relevant group to be identified from his sample of general U.S. adults. The "sensitivity analysis" he conducted among respondents with children ages 5 to 9 years old also does not match the relevant population. It is both underinclusive (e.g., it excludes respondents who purchase kids' yogurt for children younger than 5 or older than 10) and overinclusive (i.e., it includes respondents who do not purchase kids' yogurt).

13.     Lastly, even though Dr. Steckel chose not to use a survey to test whether consumers attend to and understand the claim-related disclosure that Chobani uses on the back of its Gimmies™ packaging, based solely on his review of academic literature, he opines that consumers are unlikely to examine the disclosure. It is my opinion that his academic literature review is not a substitute for an empirical study and cannot be used to draw conclusions about whether purchasers of Chobani Gimmies™ examine and understand the disclosure.

## IV.     Evaluation of Dr. Steckel's Survey

14.     In his chapter on survey critiques, Jerre Swann states "There are flaws that should lead to survey exclusion without extensive analysis or data. There are flaws, indeed, that should not require a critique. Two examples follow."[2]   The two examples given are (1) "a complete divergence 'from the conditions that potential purchasers encounter in the parties' marketplace.'"[3]

---

[2] Swann, Jerre. 2012. "Survey Critiques" Pp. 363-375 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann (hereinafter "Swann"), p. 373.

[3] Swann, p. 374.

and (2) "a survey without a control cell or with a fundamentally inadequate control stimulus."[4] Dr. Steckel's survey suffers from both of these flaws. I describe these flaws, as well as others, in the paragraphs below.

## A.    Dr. Steckel Does Not Replicate Market Conditions

15.    The validity of a survey used in a Lanham Act case depends on how well it replicates market conditions. Specifically, the key issue is whether the stimulus shown to the survey respondents corresponds to the way consumers would encounter the actual product or advertisement in the marketplace. Surveys that do not properly replicate market conditions or those that distort the stimulus being tested are often subject to exclusion.[5] For example, surveys have been excluded in false advertising cases for showing only parts of the product in question and for presenting only parts of the advertisement at issue.[6]

16.    In the present case, Dr. Steckel chose not to show the claim at issue at all. None of his respondents were shown the Chobani Gimmies™ packaging and the claims and disclosures listed on it. Instead, he presented respondents with a hypothetical comparative claim made by a fictitious ice cream brand. This claim was presented in paragraph form and divorced from any product packaging or other context that a consumer would normally encounter with such claims, including the disclosure at issue. In fact, Dr. Steckel does not test the disclosure at all.

17.    The claim Dr. Steckel tests is shown below in Figure 1:

**Figure 1: Dr. Steckel's Test Stimulus**

The ACME and AJAX companies both sell mini (single serving) cups of ice cream. Both companies offer these mini cups in three flavors: cookies & cream, butter pecan, and mint chocolate chip. ACME's mini cups contain 4 ounces of ice cream while AJAX's contain 3.5 ounces. Now imagine you go into the store and see ACME's ice cream mini cups. Each mini cup claims that it has 25 percent less fat than AJAX.

---

[4] Swann, p. 373.

[5] Edwards, G. Kip. 2012. "The *Daubert* Revolution and Lanham Act Surveys." Pp.329-362 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann (hereinafter, "Edwards"), pp. 346-348. ("[T]he failure to simulate marketplace conditions is a frequent basis for a *Daubert* challenge.")

[6] Edwards, pp. 346-348.

In contrast, the Chobani claim and disclosures appears on the product Chobani packaging, as shown in Figures 2 and 3 below.

**Figure 2: Example of Chobani Gimmies™ Packaging**



**Figure 3: Example of Chobani Gimmies™ Packaging**



18. As illustrated in Figures 1 through 3, Dr. Steckel's survey fails to replicate marketplace conditions in three important ways. *First,* the stimulus he tests is not the actual Chobani claim. Instead of testing the actual Chobani claim, Dr. Steckel presents a comparative claim in paragraph form about the amount of fat in two fictitious brands of ice cream and then purports to test respondents' understanding of this claim.

19. *Second*, the stimulus he tests does not present the claim in the same context in which a purchaser would see and evaluate the Chobani claim. The Chobani claim at issue appears on product packaging along with other claims, other nutritional information, and importantly, a disclosure related to the claim at issue stating "Chobani® Gimmies™ Milkshakes: avg. 8g sugar; leading kids' drinkable yogurt: avg. 12g sugar per 4 fl oz serving." Dr. Steckel's

ice cream claim is not presented in a manner that is in any way similar to the way the actual Chobani claim appears.

20.     The other information on the Chobani packaging is critical to how consumers may attend to and interpret the "33% less sugar than leading kids' drinkable yogurt" claim, yet such information is missing from Dr. Steckel's paragraph presentation. For example, the Chobani Gimmies™ packaging also includes the claim "20% larger vs. leading kids' drinkable yogurt." This is part of the context in which consumers would observe the claim at issue and may contribute to their understanding of it. Yet, Dr. Steckel's survey does not measure the effect of this information because he failed to test the actual claim on the actual product packaging.

21.     Importantly, whereas the Chobani label discloses information about the sugar content of both Chobani Gimmies™ and the leading kids' drinkable yogurt that forms the basis of the comparative claim, his hypothetical claim does not provide respondents with a similar disclosure. On the back of the Chobani Gimmies™ packaging, the following two disclosures appear below the Nutrition Facts panel:

- "Chobani® Gimmies™ Milkshakes: avg. 8g sugar; leading kids' drinkable yogurt: avg. 12g sugar per 4 fl oz serving."

- "Chobani® Gimmies™ Milkshakes: net 4 fl oz; leading kids' drinkable yogurt: net 3.1 fl oz."

22.     The first statement discloses information that forms the basis of the "33% less sugar" claim, while the second statement discloses the serving sizes for Chobani Gimmies™ and the leading kids' drinkable yogurt. While Dr. Steckel's ice cream claim informed respondents about the different serving sizes for the two brands of ice cream mentioned in the claim, it did not provide them with the underlying numbers for the "25% less fat" claim, nor the size of the difference between these numbers. This is a critical oversight as the disclosure on the Chobani packaging provides consumers with the average sugar content holding volume constant.[7]

---

[7] *See* Federal Trade Commission, Enforcement Policy Statement on Food Advertising (May 13, 1994), *available at* https://www.ftc.gov/public-statements/1994/05/enforcement-policy-statement-food-advertising (requiring that advertisers "make clear the basis for [a] comparison" between foods by, among other things, use of a "common standard of measurement.")

23.     *Third*, the key details of Dr. Steckel's hypothetical claim differ from the actual Chobani claim. His stimulus uses: a different product (ice cream instead of kids' drinkable yogurt); a different nutrient (fat instead of sugar); different serving sizes for the comparative product (3.5 ounces instead of 3.1 ounces); and different comparative claims (25% less instead of 33% less). In addition, while the comparative product in the Chobani Gimmies™ claim is an unnamed competitor described as the "leading kids' drinkable yogurt," the hypothetical claim tested by Dr. Steckel compares two named manufacturers. Moreover, the phrasing of the tested claim is different. While the Chobani claim states, "33% less sugar than leading kids' drinkable yogurt" the tested claim mentions the product architecture, stating, "Each mini cup claims that it has 25 percent less fat than AJAX."  Instead of focusing respondents' attention on "mini cup"— which is later one of the response options to his survey question about the claim—Dr. Steckel could have phrased this claim as "ACME claims that it has 25 percent less fat than AJAX" or the "The label claims that it has 25 percent less fat than AJAX." By mentioning "mini cups" as part of the claim, Dr. Steckel may have biased his respondents' survey answers. Dr. Steckel offers no rationale for phrasing the claim differently than the Chobani claim, nor does he offer any rational for the other departures from the actual claim.

24.     In sum, there are important differences between the hypothetical claim Dr. Steckel presented to his respondents and the actual Chobani Gimmies™ claim that render Dr. Steckel's survey results an unreliable indicator of whether consumers understand the Chobani claim. Specifically, in contrast to the Chobani claim, the hypothetical claim:

- is shown in paragraph form instead of in the context of the product packaging;
- is not shown with other claims that may be relevant to consumers' understanding and interpretation of the claim at issue (e.g., "the 20% larger" claim);
- does not disclose the numbers that serve as the basis for the comparative claim, i.e., the disclosure on Gimmies™ milkshakes that states "Chobani® Gimmies™ Milkshakes: avg. 8g sugar; leading kids' drinkable yogurt: avg. 12g sugar per 4 fl oz serving."
- is based on the wrong product, ice cream;
- features a different nutrient, fat;

- uses 3.5 ounce serving size for the comparison product, not the 3.1 ounce serving size of Dannon's Danimals;

- makes a direct comparative claim between two specific manufacturers, rather than a claim against a "leading", unidentified competitor; and

- uses different claim phrasing, including the use of the product architecture.

Dr. Steckel's survey thus clearly fails to replicate the market conditions in which the Chobani claim would be evaluated by consumers. As a result, his survey tells us nothing about how Chobani Gimmies™ purchasers would interpret the "33% less sugar than leading kids' drinkable yogurt" claim and disclosure found on the product label.

## B.        Dr. Steckel Does Not Include a Control Group or Control Question

25.    Surveys are often used in false advertising cases to help the trier of fact assess whether an advertised claim misleads or confuses consumers. Such surveys need to be designed to test the proposition of whether the advertised claim *causes* consumers to be misled. In other words, the survey needs to demonstrate that any misimpressions the consumer holds are due to the advertised claim and are not attributable to other factors.[8] Survey experts use control groups (or in some cases, control questions) to isolate the claim as the source of respondents' impressions or misimpressions.

26.    A control group is a group of respondents who are shown a "control stimulus" and are then asked the same survey questions as the group of respondents who were shown the allegedly misleading claim (this first group is known as the "test group"). In her chapter of survey research, Dr. Diamond explains the criterion for selecting a proper control:

> In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.[9]

---

[8] Diamond, Shari S. 2011. "Reference Guide on Survey Research," Pp. 361-423 in *Reference Manual on Scientific Evidence,* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council (hereinafter, "Diamond"), p. 397-401.

[9] Diamond, p. 399.

In false advertising cases, control groups are commonly shown the same advertisement or product packaging as the test group, with the key exception that the claim at issue is either removed entirely or clarified so that it is no longer allegedly misleading.

27.     The use of a control group allows the survey expert to measure the level of "survey noise" that is attributable to factors other than the advertising claim. These factors include respondents' pre-existing beliefs or impressions, answers that are due to the use of leading or closed-ended questions, aspects of the survey design, and guessing.

28.     The control group results play a critical role in the interpretation and reporting of the overall survey results. The control group results serve as a "baseline" measurement of the response levels that are due to factors other than the advertised claim. To determine whether an advertising claim causes respondents to have a particular impression or misimpression, the control group results are thus subtracted from the test group results. This "net difference" between the two results represents the response level that is attributable to the advertised claim.

29.     Dr. Steckel did *not* include a control group in his study. Bruce Keller notes in his chapter on false advertising surveys, "[t]he failure to use a control group, or otherwise show there is no need for one, can be fatal."[10] Mr. Keller also notes that "Today, most courts will reject or give little weight to surveys that have no control group to control for consumers' preexisting beliefs."[11] Likewise, Jerre Swann states "[S]urveys are still offered without a control cell or with a fundamentally inadequate control stimulus, and such surveys should be excluded or (in a bench trial) wholly discounted."[12]  Nowhere in his report does Dr. Steckel address why he did not include a control group.

30.     Without a control group, it is impossible to assess whether the phrasing of the tested claim, the use of closed-ended questions, or the question wording used had an impact on

---

[10] Keller, Bruce P. 2012. "Survey Evidence in False Advertising Cases." Pp. 167-197 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann (hereinafter, "Keller"), p. 182.

[11] Keller, p. 183.

[12] Swann. p. 374. There are some exceptions in which a control group may not be needed in a Lanham Act survey. For example, surveys that assess genericness or secondary meaning do not always include a control group. In addition, likelihood of confusion surveys that purport to show no likelihood of a confusion sometimes forego a control group if the test group results show a negligible amount of confusion; in such cases, the test group results are usually already well below any threshold for establishing a likelihood of confusion and subtracting the level of survey noise measured by a control group would only make it lower. These exceptions do not apply here.

respondents' answers. The level of guessing is also unknown. As a result of Dr. Steckel's failure to use a control group or control question, the results of his survey have no clear interpretation as we cannot identify the response level attributable to the tested claim versus the response level due to survey noise.

## C.  Dr. Steckel's Study Includes Closed-ended Questions Only and Does Not Follow the Standard Format for False Advertising Studies

31.    In its complaint, Dannon alleges that the Chobani Gimmies™ packaging makes three false claims: "The False 33% Less Sugar Claim," "The False 8g Sugar Claim," and "The False Danimals Serving Size Claim."[13] Dannon alleges that through these claims Chobani has "falsely advertised its Products as having less sugar than in fact they do"[14] and that "consumers of kids' drinkable dairy products are likely to view the Chobani Gimmies Products as healthier based on Chobani's materially false statements."[15] Dr. Steckel's survey, however, only purports to address the  "33% Less Sugar" claim. The other two claims, the "8g Sugar Claim" and the "Danimals Serving Size Claim" appear in disclosures on the Chobani Gimmies™ packaging, which Dr. Steckel does not test; in fact, he assumes instead, based on his literature review, that consumers would be unlikely to read these disclosures. In addition to not addressing the "8g Sugar Claim" and the "Danimals Serving Size Claim," Dr. Steckel's survey does not ask any questions that measure whether respondents interpret the Chobani claims to mean that the Chobani products are healthier, nor did his survey stimulus include information about other nutrients (e.g., protein, probiotics, and calcium) that might allow him to test Dannon's allegations about consumers' viewing Chobani Gimmies™ as "healthier" based on the purportedly false claims that Dannon identifies.

32.    In his purported test of the "33% Less Sugar" claim, Dr. Steckel fails to use standard and court-accepted formats for studies in false advertising cases.[16] Consumer perception studies in false advertising cases generally use a "funnel approach" that begins with open-ended

---

[13] Complaint, Danone US, LLC v. Chobani, LLC, In the United States District Court for the Southern District of New York, 18 CV 11702, December 14, 2018 (hereinafter "Complaint"), ¶¶37-39

[14] Complaint, ¶32.

[15] Complaint, ¶60.

[16] See Keller, 2012.

questions that measure what messages the ad conveyed to respondents, followed by filter questions that determine whether respondents noticed the claim at issue, and if they did, open and closed-ended questions to determine how respondents understood the claim. In other words, such surveys measure (1) how likely it is that consumers notice or attend to the claim at issue; and (2) how respondents interpret the challenged claim. Dr. Steckel's survey does not attempt at all to address or survey how likely it is that consumers notice and attend to the Chobani claim. Instead, his survey assumes that *all* consumers would attend to the claim. This assumption is unfounded.

33.     To test whether respondents attend to the claim, a proper survey would have shown the respondents the Chobani Gimmies™ packaging and then asked them an open-ended question such as "What message or messages did the product packaging convey to you?" Such a question would measure whether the "33% less sugar" message was one of the top messages that respondents took away from the product's packaging. However, because some respondents are more articulate than others, one cannot infer that those who failed to mention the "33% less sugar" claim did not notice it. Thus, the survey would then need to include additional questions that more directly measure whether respondents noticed the claim (e.g., "Did the product packaging communicate anything about how much sugar is in this product?" If the respondent answers affirmatively, he or she would be asked, "What did the product packaging communicate about how much sugar is in this product?").[17]

34.     Only after the survey establishes that the respondent noticed and attended to the "33% less sugar" claim would questions that directly address how respondents interpreted the comparative claim be appropriate. Such questions should only be asked of the subset of respondents who noticed the claim.

35.     In contrast to this approach, Dr. Steckel simply assumed that all consumers would notice the claim. His survey does not address whether respondents would have attended to the Chobani claim. Thus, even if his survey provided a valid measure of how respondents who attend to the claim understood it—and it does not—it would still overstate the percentage of *all*

_____

[17] These questions are meant to be illustrative and are not an exhaustive list of the questions that would be included in such a survey.

consumers who were confused or misled because it fails to provide any measure of the share of respondents who notice the claim in the first place.

36.     Instead of using the standard funnel-approach, Dr. Steckel used just two closed-ended questions to measure respondents' understanding of the ice cream claim. One question asked:

> "Would you most likely assume that the comparison is made with respect to the fat content per mini cup, the fat content per ounce, or do you not know?"

The three response options were "Per mini-cup" "Per ounce" and "Don't know/Not sure."

37.     The second question asked:

> If you know, would you most likely assume that the comparison is made for the fat content of each flavor independently (e.g., ACME cookies & cream vs. AJAX cookies & cream, etc.), the fat content of the average of all three flavors for the two brands (i.e., the average fat content of ACME cookies & cream, butter pecan, and mint chocolate chip vs. the average fat content of AJAX cookies & cream, butter pecan, and mint chocolate chip), or something else?

The four response options were "Each flavor independently", "The average of all three flavors", "Neither of the above", and "Don't know/Not sure."

38.     Both of these questions were displayed to respondents at the same time, although the order in which they were listed varied across respondents. I note that it is not typical for online Lanham Act surveys to display questions on the same screen, as the content of one question may influence how respondents interpret the other.[18] An example of how the questions appeared to some respondents is below in Figure 4.[19]

---

[18] Dr. Steckel's screenshots reveal that the other survey questions were displayed on individual screens, one at a time. See Steckel Report.

[19] The order of the two questions was rotated across respondents. However, given that they appeared on the same screen, the rotation may not have had any impact. See Diamond, p. 395-396, for a discussion of order effects.

**Figure 4: Screenshot of Dr. Steckel's Key Survey Questions**



39.     Each of these questions is long and wordy and it is possible that the question wording may have been unclear to some respondents. However, because these are closed-ended questions, even respondents who are unclear about the meaning of the question are able to provide an answer. Dr. Steckel's survey does not include any way to account for such answers.

40.     I note that although Dr. Steckel rotated the order of the response options, his questionnaire does not indicate that the order of the response options in the question stem was rotated. Thus, it appears that the first question always mentioned "fat content per mini cup" first while the second question always mentioned "each flavor independently" first. The order in which the response options were introduced in the survey question could have influenced the answers respondents gave. As I described in the last section, a control group is needed to

measure the response level that is due to the question wording or order rather than the respondents' understanding of the claim. But a control group was missing here.

41.     Dr. Steckel indicates that he conducted a pre-test of 15 respondents to determine whether respondents understood his survey questions. I note that he did not disclose how these respondents were recruited, whether they work for either him or Analysis Group, if they are part of the target population, nor did he disclose the answers they gave to the pretest. The moderator instructions suggest the pretest was conducted in-person and that the respondents did not complete the survey online. Thus, the pre-test conditions were different than the way in which the survey respondents would have experienced the survey. I further note that while a pre-test is helpful for identifying potential problems with a survey, it does not take the place of a control group.

## D.     Dr. Steckel Did Not Survey the Relevant Population

42.     Defining the relevant universe is widely-recognized as a critical step in survey design. For example, the *Manual for Complex Litigation,* which lists seven factors to consider in evaluating the admissibility of a survey, advises evaluators to assess whether "the population was properly chosen and defined."[20] As Shari Diamond explains in her chapter on survey research in the *Reference Guide on Scientific Evidence*: "One of the first steps in designing a survey or deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent."[21] She further states that "[a] survey that provides information about a wholly irrelevant population is itself irrelevant. Courts are likely to exclude the survey or accord it little weight."[22]

43.     The proper universe for a false advertising survey is the advertiser's target market. This principle is recognized in two different chapters in *Trademark and Deceptive*

---

[20] Federal Judicial Center. 2004. *Manual for Complex Litigation, Fourth Edition*, §11.493, pp.102-104.

[21] Diamond, p. 376.

[22] Diamond, p. 377.

*Advertising Surveys,* published by the American Bar Association. In his chapter describing issues related to defining the proper universe, William Barber notes:

> [L]ogic dictates that a survey testing whether an advertisement is likely to mislead or deceive consumers should focus on those consumers to whom the ad is directed (i.e., the advertiser's potential customers).[23]

Likewise, in his chapter on false advertising surveys, Bruce Keller advises that:

> To test what message consumers receive from an allegedly false or misleading advertisement, litigants must survey potential prospective purchasers of the advertiser's product.[24]

Dr. Steckel chose to ignore these guidelines and instead conducted his survey among the general U.S. adult population. He made no attempt to determine whether his respondents were purchasers of kids' yogurt, and his identification of a subgroup of respondents who are parents of 5 to 9 year old children does not correct for the overinclusive nature of his population.

44.     In order to be relevant, Dr. Steckel's survey should have focused on purchasers of kids' yogurt. Consumers purchasing yogurt for children may examine nutrition claims on products differently than other member of the general population. Dr. Steckel cannot generalize from a survey of the general population to kids' yogurt purchasers more generally. As Shari Diamond explains, "[t]he definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers. For example, consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase."[25]

45.     Of his 595 respondents, Dr. Steckel observed that 119 of them were parents to 5 to 9 year old children.[26] To the extent that they are not purchasers of kids' yogurt, many, if not most, of the other 476 respondents who completed Dr. Steckel's survey are not part of the relevant population.

---

[23] Barber, William. 2012. "The Universe." Pp.27-49 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* edited by Shari Seidman Diamond and Jerre B. Swann, p. 36.

[24] Keller, p. 179.

[25] Diamond, p. 377.

[26] Steckel Report, ¶41.

46.      Dr. Steckel identifies the group of respondents who have children between 5 and 9 years old as "Chobani's relevant consumer target group."[27] However, his survey fails to determine whether these respondents are purchasers of kids' yogurt. Dr. Steckel therefore does not know how many of these 119 respondents are part of the relevant population. I also note that while parents of 5 to 9 year old children who purchase kids' yogurt are part of the relevant population, the proper universe is broader than this group and includes all purchasers of kids' yogurt (e.g., parents of kids younger than four or older than 9, grandparents who purchase kids' yogurt, etc.).

47.      Dr. Steckel acknowledges the limitation with his study's population, noting:

> Importantly, this study does not completely reflect how potential purchasers of Chobani's Gimmies milkshakes would see the "33% less sugar than leading kids' drinkable yogurt" claim displayed on the packaging of the Chobani's milkshake products. The short time horizon available did not allow for the construction and implementation of such a study.[28]

He does not elaborate on what aspect of such a study was not feasible in the timeframe he had available. Specifically, he does not state whether he believed it was not possible to identify purchasers of kids' yogurt or to design a survey that showed the product. In any event, neither of these arguments has merit, as discussed below.

48.      Dr. Steckel seems to suggest that conducting the survey among the relevant population was the problem. He says, "Ice cream's greater penetration ensured that I would be able to procure an adequate sample size."[29] However, I note that Dr. Steckel's screening criteria did not require that respondents report that they were ice cream purchasers. It is unclear why Dr. Steckel felt he needed to change the product from yogurt to ice cream when he did not use any screening criteria to identify ice cream purchasers. He also provides no support for his assertion that ice cream has greater consumer penetration. In fact, Nielsen data show that yogurt penetration and ice cream penetration are rather similar.[30]

---

[27] Steckel Report, ¶41.

[28] Steckel Report, ¶16.

[29] Steckel Report, ¶27.

[30] For example, for the last 52 weeks ending on December 1, 2018, 80.2 percent of households purchased yogurt and 83.1 percent purchased ice cream. For the last 13 weeks ending on December 1, 2018, yogurt penetration was higher than ice cream (58.3 percent v. 54.2 percent). Nielsen Answers Report, run date January 9, 2019.

49.     Dr. Steckel's report was submitted on December 31, 2018, six days after he completed data collection. His survey interviews were collected between December 20 and December 25, 2018.[31] Dr. Steckel presents no evidence that 10 days was not sufficient for collecting data from purchasers of kids' yogurt. In addition, online panels, including Research Now SSI, have the ability to pre-screen respondents to help expedite the identification of respondents who may potentially qualify for a study. Even with the holiday period, Dr. Steckel should have had enough time to collect data from kids' yogurt purchasers, rather than a much less relevant population.

## E.      Dr. Steckel Does Not Conclude Consumers are Likely to Be Misled by Chobani Gimmies' Packaging and Claim

50.     Dr. Steckel claims that "his study is meant to provide an *indication* of how U.S. consumers are likely to interpret the *type* of claim found on the packaging of Chobani's Gimmies products and communicated via other channels."[32] However, because he did not test the actual claim on the Chobani Gimmies™ packaging, he cannot draw any conclusions about whether consumers are confused or misled by the Chobani claim. Notably, despite suggesting that consumers could be misled by the "33% less sugar" claim into believing that "a serving of Chobani's products is healthier than Dannon's products" or that "Chobani's products have less sugar than they really do," Dr. Steckel draws no conclusions about the likelihood that consumers are misled in these ways.[33]

51.     Despite not testing the Chobani claim, based on his survey, Dr. Steckel opines that "[o]nly a small fraction of the U.S. adult population in general, and a small fraction of potential purchasers of Chobani's Gimmies milkshakes in particular, would likely interpret the '33% less sugar than the leading kids' drinkable yogurt' claim in accordance with the fine-print disclaimer found on the back of Chobani's Gimmies' packaging."[34] For all of the reasons I described earlier, this conclusion is not supported by his study design.

---

[31] Steckel Report, ¶34.

[32] Steckel Report, ¶27.

[33] Steckel Report, ¶24.

[34] Steckel Report, ¶18.

# V.      Evaluation of Dr. Steckel's Literature Review

## A.      Dr. Steckel's Literature Review Is Not a Subsitute for an Empirical Study on Whether Chobani Consumers Attend to and Understand the Disclosure

52.      Dr. Steckel opines that "the academic literature suggests that potential purchasers of Chobani's Gimmies milkshakes are unlikely to examine the fine-print disclaimer pertaining to the comparison of sugar content between Gimmies' milkshakes and the leading kids' drinkable yogurt. (i.e., Danimals smoothies) in detail."[35] Importantly, Dr. Steckel's opinion about whether potential purchasers of Gimmies™ milkshakes would read the disclosure is <u>not</u> based on any survey evidence, even though this is exactly the type of proposition that is suitable for testing via a survey. As I explain below, Dr. Steckel's literature review is not a substitute for an empirical test of whether consumers attend to and understand the disclosure and it is inappropriate to extrapolate from these studies any conclusions about whether consumers would notice and understand the Chobani disclosure.

53.      In general, the studies to which Dr. Steckel cites concern different products, have different purposes, or consider issues, such as nutritional knowledge, that he does not address. For example, as shown in Exhibit C, none of the academic literature cited by Dr. Steckel focuses on kids' yogurt purchasers and indeed, several of the articles are not even about food products.

54.      Of the studies cited by Dr. Steckel in his review, only one study addressed labeling within the yogurt industry (Bialkova and van Trijp, 2010). Dr. Steckel cites to this study as evidence that "consumer attention to nutrition labels depends on the label size, location on the packaging, and color scheme."[36] Dr. Steckel fails to mention that this study, based on only 24 respondents, focused solely on front packaging and does not address whether consumers review disclosures or nutrition information elsewhere on product packaging.

55.      Other studies cited by Dr. Steckel were not concerned with the yogurt industry, nor did they address whether consumers attend to disclosures similar to the Chobani disclosure.

---

[35] Steckel Report, ¶17.

[36] Steckel Report, ¶19.

For example, Dr. Steckel cites to Graham and Jeffery (2011), noting that "Nutrition information that is centrally located or located on the front of the package is more likely to be attended to than nutrition information located in the periphery."[37] While the authors do acknowledge this, the context with which they were making this admission is critical. The findings of the study were qualified in the context of being on a computer screen, as opposed to in-store, where consumers can pick up products and fully inspect them.

56.     Based on no survey evidence whatsoever, Dr. Steckel suggests that "the footnote disclaimer on the back of Gimmies' packaging associated with the at-issue claim may emphasize the claim without providing the necessary clarification."[38] However, the literature he cites as support for this contention is based on a study of a camera advertisement included in a 12-page advertising booklet. The cognitive effort needed to review and encode 12 pages of material is much different than the cognitive effort of reviewing a claim and disclosure on a package of kids' yogurt.

57.     Lastly, Dr. Steckel evokes Soederberg Miller and Cassady's meta-analysis to claim consumers "may not be able to comprehend what is being presented" to them;[39] however, within this meta-analysis, the authors cite to studies showing consumers do understand "at least some basic nutrition information on food labels" and that consumer could identify nutrient differences between products.[40]

58.     Additionally, within this article, the authors find there is a positive association between prior nutritional knowledge and using nutritional labels;[41] however, Dr. Steckel does not condition his study on prior nutritional knowledge. Thus, he has no way of knowing whether

---

[37] Steckel Report, ¶19, fn. 19.

[38] Steckel Report, ¶19.

[39] Steckel Report, ¶22.

[40] Soederberg Miller & Cassady at p. 209. These authors cite: Graham, Dan J. & Jeffery, Robert W. 2011. "Location, Location, Location: Eye-Tracking Evidence that Consumers Preferentially View Prominently Positioned Nutrition Information." *Journal of the American Dietetic Association* 111(11): 1704-1711; Grunert K, & Wills J. 2007. "A Review of European Research on Consumer Response to Nutrition Information on Food Labels." *Journal of Public Health* 15(5):385–399; Levy AS & Fein SB. 1998. "Consumers' ability to perform tasks using nutrition labels." *Journal of Nutrition Education and Behavior* 30(4):210–217; and Miller CK, Probart CK, & Achterberg CL. 1997. "Knowledge and Misconceptions about the Food Label among Women with Non-Insulin-Dependent Diabetes Mellitus." *The Diabetes Educator* 23(4):425–432.

[41] Soederberg Miller & Cassady at p. 210. Here, studies on this point that are cited in this article include Hess et al., 2012 and Cooke & Papadaki, 2014.

potential purchasers have prior knowledge of the nutritional components of kids' yogurt which they could use when examining the disclosures on the packaging.

*Melissa Pittaoulis*

Melissa Pittaoulis

January 10, 2019

Signature of Notary

1/10/2019

*Amy Seemuller*

Commonwealth of Pennsylvania - Notary Seal
Amy Seemuller, Notary Public
Philadelphia County
My commission expires December 15, 2022
Commission number 1287148
Member, Pennsylvania Association of Notaries

23

# Exhibit A



**Melissa Pittaoulis**
Associate Director

National Economic Research Associates, Inc.
Three Logan Square, Suite 1100
Philadelphia, Pennsylvania 19103
+1 215 864 3880 Fax +1 215 864 3849
Direct dial: 215-864-3879
melissa.pittaoulis@nera.com
www.nera.com

# Melissa Pittaoulis
## Associate Director

Dr. Pittaoulis is an Associate Director based in NERA's Philadelphia office. Dr. Pittaoulis specializes in survey research, statistical sampling, and demography. Her survey research experience includes designing research, writing questionnaires, supervising data collection, and analyzing data. In addition to designing surveys, Dr. Pittaoulis also reviews and evaluates third-party surveys.

Dr. Pittaoulis has extensive experience working on surveys used in intellectual property disputes concerning false advertising and trademark and trade dress infringement. In the area of trademark and trade dress infringement, Dr. Pittaoulis' project experience includes participating in the design of surveys used to establish likelihood of confusion, secondary meaning, and genericness. She has conducted false advertising and trademark surveys using different modes of data collection, including telephone, mall-intercept, and the Internet.

Dr. Pittaoulis also has experience designing and evaluating conjoint surveys used to assess the value of product features. Such surveys are used in a variety of contexts, including patent cases, class actions, and antitrust matters.

Dr. Pittaoulis' sampling expertise includes designing sampling plans, selecting samples, and calculating sample estimates and confidence intervals. Her demography work has concentrated on producing population estimates used in determining class certification.

Dr. Pittaoulis has worked on survey and sampling projects in a wide variety of industries, including: automobiles, beverages, beauty products, clothing apparel, computers, financial products, insurance, mobile phones, personal care products, pharmaceuticals, snack foods, and video games. In addition, Dr. Pittaoulis has considerable experience with radio and television audience measurement. She has also conducted studies on cost-sharing in the Medicare Part D program.

In addition to her work at NERA, Dr. Pittaoulis has taught statistics at the undergraduate level at Temple University.

Melissa Pittaoulis

## Education

**Temple University**
Ph.D., Sociology 2012
M.A., Sociology, 2004

**La Salle University**
B.A., Sociology and Criminal Justice, 2000

## Professional Experience

**NERA Economic Consulting**
2017-Present   Associate Director

2013-2017      Senior Consultant

2011-2013      Consultant

2006-2011      Senior Analyst

2003-2006      Research Associate

2003-2005      **Temple University**
               Instructor
               Taught undergraduate courses in statistics

               Teaching Assistant
               Taught lab sections for undergraduate courses in statistics

## Honors and Professional Activities

University Fellowship, Temple University, 2002-2006
University Scholarship, La Salle University, 1996-2000
Member, American Association of Public Opinion Research
Member, American Sociological Association
Member, International Trademark Association
Member, DRI

## Presentations

**Presenter**

"How to Effectively Use Statistical Sampling in Class Action Litigation: Tips and Strategies in 2018." Webinar presented by The Knowledge Group in 2017.

Participant on panel entitled "Building a Defensive IP Strategy: Leveraging the Favorable Landscape." Centerforce IP Strategy Summit Series, June 7, 2017.

"Competitor's Comparative Advertising: Practical Guide and Best Practices in Winning Your Claims in 2016." Webinar presented by The Knowledge Group in 2016.

"Hot Topics in Online Behavioral Advertising for 2015 Explored!"  Webinar presented by The Knowledge Group in 2015.

"Attitudes and Approaches Towards Choosing a College Major" at American Sociological Association in 2013.

"Designing and Defending Surveys Used in Commercial Litigation" at American Association of Public Opinion Research in 2013.

"College Students' Motivations for Choosing Academic Majors," at Eastern Sociological Society in 2010.

 "The Impact of Work-Family Conflict on Job Satisfaction," at Eastern Sociological Society in 2005.

**Presider**
Eastern Sociological Society, Philadelphia, Pennsylvania March 2010

## Papers and Publications

"Control Groups in Lanham Act Surveys," with Eugene P. Ericksen, *The Trademark Reporter*, May-June 2014 Vol. 104 No. 3.

"Comments on EPA's Notice of Data Availability for §316(b) Stated Preference Survey," with David Harrison et al., NERA Working Paper, July 2012.

"How Much Does that Medication Cost? A Study of Medicare Beneficiaries' Knowledge of Out-of-Pocket Costs for Prescription Drugs on the Specialty Tier," with Eugene P. Ericksen, NERA Working Paper, August 2011.

## Expert Testimony

*Tracy Sanborn and Louis Lucrezia et al.\* v. Nissan North America Inc., Nissan Motor Company, LTD.*, United States District Court, Southern District of Florida [Deposition: February 11, 2016]
Designed and conducted a conjoint survey to evaluate impact of a disclosure on consumer preferences and willingness to pay.

*Terrance Justice, Andrea Hatfield et al.\* v. Rheem Manufacturing Company,* United States District Court, Southern District of Florida [Deposition: March 1, 2016]
Designed a conjoint survey to evaluate impact of a disclosure on consumer preferences and willingness to pay.

*Edible Arrangements International, LLC and Edible Arrangements, LLC v. 1-800-Flowers.com, Inc., 800-Flowers, Inc.\*, and June V. Delaney and David Delaney d/b/a Fruit Bouquets Staten Island*, United States District Court, District of Connecticut [Deposition: May 3, 2016]
Evaluated a genericness survey.

*In Re: Fluidmaster, Inc. Water Connector Components Products Liability Litigation*, United States District Court, Northern District of Illinois [Deposition: June 6, 2016]
Designed a conjoint survey to evaluate impact of a disclosure on consumer preferences and willingness to pay.

*Trump Old Post Office, LLC\* v. CZ-National, LLC and BVS Acquisition Co.*, LLC Superior Court for the District of Columbia, Civil Division [Deposition: July 7, 2016]
Evaluated a consumer survey.

*Wendy and Nicholas Grasso et al.\* v. Electrolux Home Products, Inc.*, United States District Court, Middle District of Florida, Tampa Division [Deposition: October 12, 2016]
Designed a conjoint survey to evaluate impact of a disclosure on consumer preferences and willingness to pay.

*The Hilsinger Company\* v. FBW Investments, LLC and Kleen Concepts, LLC.*, United States District Court, District of Massachusetts [Deposition: February 15, 2017]
Designed and conducted a likelihood of confusion survey.

*Hi-Tech Pharmaceuticals, Inc.\* v. Dynamic Sports Nutrition, LLC d/b/a Anabolic Research, PBB Trademark Holdings, LLC, and Brian Clapp.*, United States District Court, Northern District of Georgia, Atlanta Division [Deposition: March 15, 2017]

*Central Bank & Trust Co. v. Gannett Satellite Information Network, Inc.\* and James Pilcher,* Commonwealth of Kentucky, Fayette Circuit Court, Division 4 [Deposition: August 8, 2017]
Evaluated opposing expert's survey.

*Fratelli Branca Distilleries S.R.L. v. F. LLI Gancia & C.S.P.A.\**, United States Patent and Trademark Office, Trademark Trial and Appeal Board [Deposition : November 17, 2017]
Evaluated opposing expert's survey.

*Hypnotic Hats, LTD.\* v. Wintermantel Enterprises, LLC; Hype Socks, LLC; and Hype Cheer, LLC.*, United States District Court, Southern District of New York [Deposition: December 19, 2017]  Designed and conducted a likelihood of confusion survey.

*Kars 4 Kids Inc. v. America Can!\*,* United States District Court, District of New Jersey [Deposition: April 4, 2018]  Evaluated opposing expert's survey.

*Republic Technologies (NA), LLC and Republic Tobacco, L.P.\* v. BBK Tobacco & Foods, LLP d/b/a HBI International*, United States District Court, Norther District of Illinois [ Deposition: May 17, 2018]  Designed and conducted a likelihood of confusion survey.

*Steve Oddo, Rajene Reardon, et al.\* v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, United States District Court, Central District of California, Santa Ana Division [Deposition: June 22, 2018]  Evaluated opposing expert's survey.

*Retaining Party

# Exhibit B

**Exhibit B**
**Documents Relied Upon**

# Expert Reports

- Expert Report of Joel H. Steckel, Ph.D., Submitted December 31, 2018 and supporting materials

# Legal Documents

- Chobani, LLC's Memorandum of Law In Opposition to Danone, US, LLC's Application for a Temporary Restraining Order, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 18, 2018.

- Court Order Rescheduling Preliminary Injunction Hearing, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated January 2, 2019.

- Electronic Court Docket Denying Plaintiff's Temporary Restraining Order, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 20, 2018.

- Memorandum In Support of Plaintiff's Application for Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 14, 2018.

- Plaintiff's Complaint and Demand for Jury Trial, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 14, 2018.

- Plaintiff's Letter of Notification of Complaint and other Case Initiating Documents to Defendant, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 14, 2018.

- Plaintiff's Application for Order to Show Cause, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 14, 2018.

# Declarations

- Declaration of Jamie A. Levitt With Attached Exhibits A and B in Support of Chobani, LLC's Opposition to Danone, US, LLC's Application for a Temporary Restraining Order,

*Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 18, 2018.

- Declaration of Katherine Goodwin In Support of Dannon's Motion for Temporary Restraining Order and Preliminary Injunction, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 13, 2018.

- Declaration of Marcella Ballard In Support of Dannon's Motion for Temporary Restraining Order and Preliminary Injunction, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 13, 2018.

- Declaration of Peter McGuinnes in Support of Chobani, LLC's Opposition to Danone, US, LLC's Application for a Temporary Restraining Order, *Danone, US, LLC v. Chobani, LLC*, United States District Court for the Southern District of New York, Case No. 1:18-cv-11702-CM, dated December 18, 2018.

## Articles and Book Chapters

- Barber, William. 2012. "The Universe." Pp.27-49 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.

- Bialkova, Svetlana, & van Trijp, Hans. 2010. "What determines consumer attention to nutrition labels?" *Food Quality and Preference*, 21(8): 1042–1051.

- Diamond, Shari S. 2011. "Reference Guide on Survey Research," Pp. 361-423 in the *Reference Manual on Scientific Evidence,* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council.

- Edwards, G. Kip. 2012. "The *Daubert* Revolution and Lanham Act Surveys." Pp.329-362 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.

- Federal Judicial Center. 2004. *Manual for Complex Litigation, Fourth Edition*, §11.493, pp.102-104.

- Graham, Dan J. & Jeffery, Robert W. 2011. "Location, Location, Location: Eye-Tracking Evidence that Consumers Preferentially View Prominently Positioned Nutrition Information." *Journal of the American Dietetic Association,* 111(11): 1704-1711.

- Grunert Klaus & Wills, Josephine. 2007 "A Review of European Research on Consumer Response to Nutrition Information on Food Labels." *Journal of Public Health,* 15(5):385–399.

- Keller, Bruce P. 2012. "Survey Evidence in False Advertising Cases." Pp. 167-197 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.

- Levy AS & Fein SB. 1998. "Consumers' ability to perform tasks using nutrition labels." *Journal of Nutrition Education and Behavior,* 30(4):210–217.

- Miller CK, Probart CK, & Achterberg CL. 1997. "Knowledge and Misconceptions about the Food Label among Women with Non-Insulin-Dependent Diabetes Mellitus." *The Diabetes Educator,* 23(4):425–432.

- Soederberg Miller, L., & Cassady, D. 2015. "The effects of nutrition knowledge on food label use. A review of the literature." *Appetite*, 92: 207–216.

- Swann, Jerre. 2012. "Survey Critiques" Pp. 363-375 in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.

## Other Documents

- Federal Trade Commission, Enforcement Policy Statement on Food Advertising (May 13, 1994), *available at* https://www.ftc.gov/public-statements/1994/05/enforcement-policy-statement-food-advertising

- Nielsen Answers Report, Run Date January 9, 2019.

# Exhibit C

**Exhibit C**
**Produts Examined in Articles Cited Within the Steckel Report**

| Cited Article | Examined Products |
| --- | --- |
| **(a)** | **(b)** |
| Anagol, S. & H.H. Kim (2012) | Mutual Funds |
| Becker et al. (2015) | Breakfast Cereal |
| Bialkova, S. & H. Van Trijp (2010) | Yogurt |
| Brown et al. (2007) | iPod Shuffles; iPod Nanos |
| Brucks et al. (1984) | Fruit Juice; Lunch Meat; Dried Fruit; Chocolate Milk Drink; Enriched French Bread |
| Foxman et al. (1988) | Auto-focus Cameras |
| Graham D.J. & R.W. Jeffery (2011) | Meal, Snack, and Dessert Foods |
| Jacoby et al. (1977) | Breakfast Cereal; Margarine |
| Morwitz et al. (1998) | Jar of Pennies; Telephones |
| Rayner et al. (2001) | Automobiles; Skin Care |

Source:
    Steckel Report

Note:
    Soederberg Miller, L.M. & D.L. Cassady (2015) and Sawyer, A.G. (1975) were literature reviews, and thus are not included in this list.