**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

DANONE, US, LLC,

                    Plaintiff,

          -against-                                    18 Civ. 11702 (CM)

CHOBANI, LLC,

                    Defendant.

---------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/23/2019

# MEMORANDUM DECISION AND ORDER DENYING PRELIMINARY INJUNCTION

McMahon, C.J.:

    This case is the latest in a series of culture wars between two of the biggest players in the market for yogurt and related products.

    Before the Court is an application, brought by Danone, US LLC ("Dannon"), for an order to show cause for a preliminary injunction enjoining Defendant Chobani, LLC ("Chobani") from advertising that Chobani's kids' drinkable yogurt product, "Gimmies Milkshakes" (hereinafter referred to as "Gimmies") contains "33% less sugar than the leading kids' drinkable yogurt" – which both parties agree is a reference to Dannon's "Danimals Smoothies" product (hereinafter referred to as "Danimals").

    On January 14, 2019, the parties appeared before this Court for an evidentiary hearing, at which the Court heard testimony from marketing executives from both companies, as well as competing marketing experts.

    After reviewing the evidence and arguments, the Court **DENIES** Dannon's application for a preliminary injunction.

1

I.   Findings of Fact

a.  The Parties and the Products

Dannon and Chobani are competitors in the yogurt and dairy products markets.  (Pl.'s Ex. 1 ¶ 11, Dkt. No. 39.)[1]

Dannon's Danimals is the leading kids' drinkable yogurt product.  (*Id.* ¶ 12).  Danimals is available in eight different flavors, all of which are packaged and sold in 3.1 fluid ounce bottle serving sizes.  (*Id.* ¶ 13; Affidavit of Niel Sandfort ("Sandfort Aff.") ¶ 18, Dkt. No. 41.)  All eight of those flavors currently contain 9 grams of sugar per 3.1 oz. serving; however, three of them – "Strikin' Strawberry Kiwi," "Wild Watermelon," and "Orange Cream" – used to contain 10 grams of sugar.  (*See* Sandfort Aff. ¶ 18; Pl.'s Ex. 1 ¶ 13.)  Dannon reduced the sugar content in those three flavors to 9 grams in approximately June 2018.  However, Dannon had packaging left over from the 10 gram days and, so as not to waste it, packaged some stockkeeping units (commonly known as "SKUs") for sale in this "stale" packaging – which means that Dannon erroneously told consumers that certain Danimals products contained more sugar than they actually did. (Prelim. Inj. Hr'g Tr. at 13:9-17:25; *see also* Sandfort Aff. ¶ 19; Def.'s Exs. 2–10 (images of Danimals' packaging); Def.'s Ex. 27–28 (Danimals Strikin' Strawberry Kiwi, Wild Watermelon, Orange Cream products, purchased Jan. 14, 2019).)  Product packaged in the stale packaging was available on grocery shelves in the New York City area as recently as January 14, 2019. (*See, e.g.*, Def.'s Ex. 28.)

After devoting much research and development into launching a yogurt product specifically for children, Chobani launched its own drinkable yogurts product, Gimmies, on

---

[1]      Citations to exhibits refer to the parties' evidentiary submissions made in advance of or at the January 14, 2019 Preliminary Injunction hearing.

November 29, 2018.  (Sandfort Aff. ¶¶ 7–4; 24.)  Chobani's Gimmies is available in three flavors, "Cookies & Cream Crush," "Bizzy Buzzy Strawberry," and "Chillin' Mint Chocolate." (*Id.* ¶ 19.)  All Gimmies products are sold in packs of six 4 fluid ounce single serving bottles – making a single serving of Gimmies slightly larger than a single serving of Danimals.  (*Id.* ¶ 20.) Until January 9, 2019, each bottle of "Cookies & Cream Crush" and "Bizzy Buzzy Strawberry" contained 9 grams of sugar, while the "Chillin' Mint Chocolate" flavor contained 7 grams of sugar.  (Sandfort Aff. ¶ 12.)  On a per ounce basis, Chobani's product had less sugar (by a gram or two) than did Dannon's.

### b. Chobani's Advertisement and Labeling of Gimmies

Gimmies bottles are packaged in paperboard overwrap labels. This outer packaging lists all information required for sale of the product, including a list of ingredients and the familiar nutritional facts panel.

In three different places, the paperboard overwrap says that Gimmies contains "33% less sugar than the leading kids' drinkable yogurt."  (Def.'s Ex. 15 (image of Gimmies' product packaging).)  The parties agree that the "leading kids' drinkable yogurt" references Dannon's Danimals.  (*Id.* ¶ 13, 17; Pl.'s Ex. ¶ 12.)  The "33% less sugar" claim appears on the front, top, and back of the packaging.  (Def.'s Ex. 15.)  On the front and top of the packaging, the claim appears in reasonably readable typeface and is in no way qualified.  The "33% less sugar" claim on the back of the packaging appears in a much smaller typeface and is asterisked.  The asterisks refer the consumer to two footnotes that are found below the nutrition facts panel, in typeface so small that it is barely legible.  (Def.'s Ex. 15.)  Those footnotes read:

> *i.* *Chobani® Gimmies™ Milkshakes: avg. 8g sugar; leading kids' drinkable yogurt: avg. 12 g sugar, per 4 fl oz serving; and

    *ii.*    \*\*Chobani® Gimmies™ Milkshakes: net 4 fl oz; leading kids' drinkable yogurt: net 3.1 fl oz.

(*Id.*)

It is indisputably the case that 7 or 8 grams of sugar is not 33% less than 9 grams of sugar, or even than 10 grams of sugar. Put otherwise, a single serving of Gimmies does not have 33% less sugar than a single serving of Danimals, no matter the flavor. However, Chobani asserts that its statement is true, and that these two footnotes disclose all the information needed for consumers to check the truth of its "33% less sugar" claim. Unfortunately for the consumer, substantiating Chobani's claim is anything but uncomplicated.

First the consumer must average (per the "avg." language in footnote (*i*)) the sugar content per 4 fluid ounce servings of all three flavors of Chobani's products,[2] and then round that calculation to the nearest gram. The average sugar content per serving in Chobani's three Gimmies flavors (which contain 9 grams, 9 grams, and 7 grams, respectively) is 8.333 grams, which rounds down to 8 grams. Significantly, the consumer has to guess what s/he is supposed to average, since the label on any particular flavor of Gimmies makes no reference to the fact that there might be other flavors of the beverage. Nor is there any mention of rounding.

The result of this averaging must then be compared with the amount of sugar in Danimals. Whether one looks at Dannon's latest nutritional figures (all eight Danimals flavors contain 9 grams of sugar per 3.1 oz. serving), or an average of the sugar in all eight flavors of Danimals as shown on the stale and erroneous packaging (five of the eight flavors contain 9 grams of sugar and the other three are advertised as containing 10 grams per serving), the result

---

[2]    This would be difficult to do if the consumer had no interest in any flavor but the one s/he was putting into the grocery cart; it would be impossible if the store happened to be sold out of one or both of the other flavors.

is the same (again, after rounding) – the sugar content per 3.1 fluid ounce bottle of Danimals is 9 grams.

The consumer must then perform additional calculations.  Since Danimals comes in 3.1 ounce servings and Gimmies in 4 oz. servings, they must be converted to a "common standard of measurement," (which is what the language of disclosure (*ii*) tries to convey).  Chobani does this by calculating that Danimals would contain 11.6 grams of sugar if it were sold in a 4 fluid ounce bottle (which it is not).[3]  (Sandfort Aff. ¶¶ 22–24.)  Chobani rounds that up to 12 grams.

Having gone through all of those contortions, Chobani is able to calculate that 12 grams of sugar is 33% more than 8 grams of sugar.

During the course of litigation, Chobani argued that the consumer could substantiate its claim in a far simpler way: dividing the number of grams of sugar in a single serve bottle of each drink by the number of ounces in the bottle yields 2 grams of sugar per ounce for Gimmies, and 3 grams of sugar per ounce of Danimals.[4]  Three grams of sugar per ounce is 33% more sugar per ounce than 2 grams per ounce.  However, this rather more elegant and easily comprehended "ounce for ounce" comparison is not suggested by anything on the packaging – especially not Chobani's barely legible footnotes.  And that is not how Chobani calculated its claim.

c.     **Prior Proceedings**

Dannon filed this action on December 14, 2018, asserting that Chobani engaged in false advertisement and deceptive business practices, in violation of Section 43(a) of the Lanham Act and N.Y. Gen. Bus. Law § 349, respectively.  (Dkt. No. 1.)

---

[3]      And as the Court noted at the TRO hearing, parents do not ordinarily give a child 1.33 servings of yogurt anything.

[4]      Again, these numbers are an average across all flavors of each beverage, rounded to the nearest gram.

5

Three days later, Dannon filed an Application for an Order to Show Cause for a Temporary Restraining Order ("TRO") and Preliminary Injunction. At a hearing on December 19, 2018, the Court denied Dannon's request for a TRO and instructed the parties to submit evidence in advance of a preliminary injunction hearing.

The Court presided over that hearing on January 14, 2019, at which the following evidence was presented.

### d. Extrinsic Evidence of Consumer Deception

Dannon produced the expert report and testimony of Dr. Joel H. Steckel, Ph.D, a professor of marketing and the vice dean for doctoral education at the Leonard N. Stern School of Business, New York University. (Pl.'s Exs. 28–29, Dkt. Nos. 35 & 40.) Dr. Steckel was retained to evaluate the likelihood that consumers would attend to and understand the footnote disclaimers on the back of Gimmies' packaging. He was also asked to design a survey of individuals living in the United States that would assess how potential purchasers of Chobani's Gimmies were likely to interpret comparative statements of the sort made by Chobani. (Pl.'s Ex. 28 ¶ 14.) He was *not* retained to do a classic Lanham Act "consumer confusion" study (which is not relevant to the issues in this case); nor did he test how consumers interpret Chobani's claims as they appear on Gimmies' packaging.

Dr. Steckel reached two conclusions.

*First*, based upon his review of academic literature, he concluded that consumers were not likely to attend to Chobani's disclaimers about the relative sugar content between Gimmies' and Danimals' yogurts, primarily because of their location on the packaging. (*Id.* ¶¶ 19–21.) Moreover, even if they *did* attend to those disclaimers, Dr. Steckel opined that consumers would not likely understand that Chobani's "33% less sugar" claim required "an averaging of

6

Chobani's three flavors, a scaling up of Dannon's serving size, and a rounding of fractional sugar contents to the nearest whole number[.]" (*Id.* ¶ 22.)

*Second*, extrapolating from the results of an online consumer survey that involved two hypothetical ice cream manufacturers and a comparative claim of the sort at issue here, Dr. Steckel concluded that significantly more consumers would interpret Chobani's "33% less sugar" claim as referring to the sugar content of a bottle of Gimmies versus a bottle of Danimals – not to an ounce of Gimmies versus an ounce of Danimals. (*Id.* ¶¶ 23–41.)

Dr. Steckel conducted an online survey of 595 U.S. adults, using the following hypothetical scenario involving two ice cream brands:

> The ACME and AJAX companies both sell mini (single serving) cups of ice cream. Both companies offer these mini cups in three flavors: cookies &cream, butter pecan, and mint chocolate chip. ACME's mini cups contain 4 ounces of ice cream while AJAX's contain 3.5 ounces. Now imagine you go into the store and see ACME's ice cream mini cups. Each mini cup claims that it has 25 percent less fat than AJAX!

(*Id.* ¶¶ 26, 37.) After asking basic demographic, quality control, and consumer history questions, Dr. Steckel asked respondents two questions:  First, he asked if they were more likely to assume that the comparison above is made with respect to fat content per cup or per ounce; and second, if they were more likely to assume that the comparison above is made with respect to each flavor independently or the average of all three flavors. (*Id.* ¶ 34–36.)  Respondents could also answer each question with "don't know/not sure." (*Id.*)

Forty-four percent of respondents thought that the comparison statement "25 percent less fat than AJAX" referred to the fat content per mini cup of ice cream, while only 28% of respondents indicated that the comparison is made with respect to the fat content per ounce of ice cream. (*Id.* ¶ 38.) Forty-five percent of respondents indicated that the comparison statement "25

percent less fat than AJAX" referred only to the specific flavor in question, while 27% of respondents indicated that the comparison is based on an average across all possible flavors that were marketed. (*Id.* ¶ 39.)

Of even greater significance, only 10% of respondents believed *both* that the comparison statement "25 percent less fat than AJAX" concerned fat content per ounce *and* was based on the average fat content across all the flavors. (*Id.* ¶ 40.) This finding suggested to Dr. Steckel that only a small fraction of consumers would interpret Chobani's "33% less sugar claim" properly. (*Id.* ¶ 40–41.)

Chobani presented the testimony of Melissa Pittaoulis, Ph.D, who criticized Dr. Steckel's findings, but performed no study of her own. Dr. Pittaoulis objected that Dr. Steckel had failed to replicate market conditions, specifically target his survey towards the relevant consumer population, and test the actual claims made by Chobani that are at issue in this case. (*See generally* Affidavit of Melissa Pittaoulis, Ph.D. ("Pittaoulis Aff."), Dkt. No. 38.) She also found fault in the design of the survey, arguing that Dr. Steckel should have used a control group and included open-ended questions to account for survey bias. (*Id.* ¶¶ 25–41.) Finally, she argued that Dr. Steckel's literature review, from which he concluded that consumers were not likely to attend to and understand Chobani's footnote disclosures and which were not incorporated into his consumer survey, was not a substitute for conducting his own empirical study to test that conclusion. (*Id.* ¶¶ 52–58.)

### e.  Relative Harms to the Parties

Dannon alleged that Chobani's alleged false advertising caused it considerable harm, which would continue absent a preliminary injunction. In addition to lost sales – coming in the wake of the post-holiday "back to school" season, which is a critical period for the company in

terms of sales, acquiring shelf space, and promoting product visibility – Dannon contended that Chobani's falsely claiming that its product had 33% less sugar than Dannon's would cause existing consumers to reconsider their loyalty to Dannon, thereby harming its customer goodwill, and that Chobani would capture prospective customers who might otherwise have belonged to Dannon. (Pl.'s Ex. 1 ¶¶ 63, 74–84.)[5]

Dannon also claimed that Chobani's conduct is especially harmful to it because it touches upon the amount of sugar content in a product designed for children. Dannon reports that it has worked hard to position Danimals as a safe and nutritious snack that parents can give to their children. (*Id.* ¶ 85.) To this end, it has "invested in the [Danimals] brand, with a particular focus on the nutrient density of the product including sugar reduction[,]" "in recognition that sugar content is a material aspect of parents' decision making in purchasing within the market segment." (*Id.* ¶¶ 63–64; *see id.* ¶¶ 66–68.)

Chobani countered with data derived from the Nielson marketing database, which indicates that, in December 2018 – the month in which Chobani began selling Gimmies in retail locations – Danimals' share of the total market for yogurt prouCts expanded rather than contracted. (Def.'s Ex. 14 at 2; Prelim. Inj. Hr'g Tr. at 10:18-11:10.) In fact, Danimals' December 2018 market share was the second highest that the product ever recorded. (Prelim. Inj. Hr'g Tr. at 13:6-12.) These figures, however, do not reflect category dynamics or absolute levels of sales; sales of kids' drinkable yogurt were generally down during the holiday season, and, according to Dannon's marketing executive, so were sales of Danimals – even though its market share was the second highest in history. (*Id.* at 11:8-12:12.)

---

[5]     The fact that consumers might decide to buy Chobani's product simply because it contained both more beverage and less sugar than Dannon's is not at issue in this case.

Chobani presented evidence suggesting that a preliminary injunction would be financially ruinous to it on several fronts.  If Chobani were forced to stop shipments of Gimmies and withdraw products from retail shelves, over 2.8 million bottles of finished yogurt products would need to be destroyed, because those bottles – which contain perishable yogurt product with a short shelf life – would expire before new labeling could be made available, resulting in millions of dollars in lost sales.  (Sandfort Aff. ¶¶ 34, 37.)  Certain component ingredients would also expire while new packaging was printed.  (*Id.* ¶ 35.)  Adding to the costs would be the logistics and labor expenses needed to ensure a proper recall.  (*Id.* ¶¶ 35–36.)   Chobani also estimates that withdrawing Gimmies could affect Chobani's ability to retain shelf space for other products – shelf space for which it has already paid substantial sums of money – which could impact its relationships with it retail customers.  (*Id.* ¶ 38, 40.)  This risk is especially pronounced, according to Chobani, since Gimmies is a newly launched product that, unlike certain legacy products, lacks consumer loyalty and a track record of resiliency to short-term market absences. (*Id.* ¶ 40.)

Finally, Chobani submits that Dannon's purported solution of "re-stickering" the 1.3 million units of finished paperboard packaging in its current possession, to cover the "33% less sugar claim" with something more accurate, would not be possible – both because of the automated process in which Gimmies' packages are prepared, and due to retailers' concerns that stickers would not survive the bruising process of shipping and stocking.  (Prelim Hr'g Tr. at 80:21-81:1, 91:6-19.)

### f.  Chobani's Revised Packaging for Gimmies

As a result of this lawsuit, Chobani took steps to address Dannon's objections to its packaging for Gimmies.

10

Niel Sandfort, Chobani's Vice President For Product Management and Innovation, testified that Chobani, which had already been engaged in efforts to further reduce the sugar content in its products since October 2018, expedited those efforts and successfully revised the recipes of "Cookies & Cream Crush" and "Bizzy Buzzy Strawberry," so that those flavors now contain 8 rather than 9 grams of sugar. (Sandfort Aff. ¶ 12; Prelim Inj. Hr'g Tr. 67:11-14; 69:19-70:1.) "Chillin' Mint Chocolate" still contains 7 grams of sugar per bottle. (Sandfort Aff. ¶ 51.) Chobani began production of the flavors with the new recipes on January 10, 2019. (*Id.* ¶ 43.)

In connection with the change in recipe and reduction in sugar, Chobani has designed, ordered, and printed new paperboard overwrap labels that are specific to the "Cookies & Cream Crush" and "Bizzy Buzzy Strawberry" flavors. (*Id.*) The packaging for those flavors now advertise that they contain "30% less sugar*" "*than the leading kids drinkable yogurt. Gimmies: 2g sugar per fl. oz.; leading kids' drinkable yogurt: 2.9g sugar per fl. oz." (Def.'s Ex. 16 (image of revised packaging).) In addition to lowering its "less sugar than" claim from 33% to 30%, Chobani is placing the easy-to-understand "ounce for ounce" sugar comparison on both the front and back of its packaging. (*Id.*)

These new labels were put into production on January 20, 2019. (Letter from Jamie A. Levitt, dated Jan. 16, 2019, at 1, Dkt. No. 51.) Over the next ten weeks, the SKUs of "Cookies & Cream Crush" and "Bizzy Buzzy Strawberry" flavors with 9 grams of sugar will be sold or will reach their expiration date; by approximately March 31, 2019, Chobani expects the 8 gram version of the two flavors, with their easy-to-understand "ounce to ounce" sugar comparison, to have penetrated the market. (Sandfort Aff. ¶ 49.) For this reason, Chobani insists that injunctive relief would not be appropriate.

11

II.    Conclusions of Law

The familiar preliminary injunction standard applies.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable harm absent a preliminary injunction; (3) that the balance of hardships favors the plaintiff; and (4) that a preliminary injunction is in the public interest. *Id.* at 20.

While Dannon would be likely to succeed on the merits, it fails to clear the other hurdles to obtaining the desired relief – including especially the *sine qua non* of the preliminary injunction: irreparable harm.

### a. Dannon Has Established a Likelihood of Success on the Merits

As noted, Dannon has alleged violations of Section 43(a) of the Lanham Act (Count I) and N.Y. Gen. Bus. Law § 349 (Count II).

#### 1. Lanham Act

The Lanham Act expressly forbids false or misleading descriptions or representations of fact "in commercial advertising or promotion" concerning "the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To establish a Lanham Act violation under § 43, Dannon must identify a statement in an advertisement that (1) is false; (2) misrepresents an inherent quality or characteristic of the product; (3) was placed in interstate commerce; and (4) has or will likely injure Dannon. *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014).

Chobani does not dispute that the alleged false advertisement concerned a material aspect of the product (sugar) and was placed in interstate commerce. Nor can it plausibly be argued that Dannon, as a direct competitor to Chobani, has not established the sort of competitive injury that suffices for Lanham Act purposes. *See Lexmark Int'l, Inc. v. Statis Control Components, Inc.*, 572 U.S. 118, 139 (2014); *Merck Eprova*, 760 F.3d at 255. The trickier question is whether that injury was irreparable – a question that will be addressed below. *Infra* at II(b). In terms of assessing Dannon's likelihood of success on the merits, all the Court must grapple with presently is whether Chobani's advertisement was false.

The Lanham Act proscribes two types of false advertisements: those that are literally false and those that are technically true but likely to mislead, *i.e.*, "impliedly false." *Merck Eprova*, 760 F.3d at 255.

A literally false advertisement "may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (internal citations omitted). In other words, when viewed in context, the advertisement must necessarily imply a false message. *Id.* If an advertisement is literally false, the court "'may enjoin the use of the message without reference to the advertisement's impact on the buying public.'" *Church & Dwight Co., Inc., SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (citing *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010). To be literally false, however, the message must be unambiguous; if the representation "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false" and the advertisement is actionable under the Lanham Act only upon a showing of actual consumer confusion. *Time Warner*, 497 F.3d at 158.

13

By contrast, a plaintiff whose Lanham Act claim is premised upon an impliedly false advertisement must support her claim by either offering extrinsic evidence of consumer confusion, or, alternatively, through evidence that the defendant intended to deceive the public through "deliberate conduct" of an "egregious nature," in which case a rebuttable presumption of consumer confusion arises. *Church & Dwight Co.*, 843 F.3d at 65 (quoting *Merck Eprova*, 760 F.3d at 255–56).

Dannon has not established a likelihood of success on the merits of a literal falsity claim. In fact, it has done the opposite: it has foreclosed such a finding as a matter of law, because it has demonstrated that, at least on the packaging that was the subject of the hearing, Chobani's "33% sugar claim" is ambiguous. *See Time Warner*, 497 F.3d at 158.  Dannon's expert, Dr. Steckel – whose testimony was credible and compelling to this fact-finder – testified that his "descriptive study" was designed to assess "how American consumers interpret the type of information that [was] [located] on [Gimmies'] package." (Prelim. Inj. Hr'g 35:20-22.)  He concluded that Chobani's advertisement was susceptible of more than one meaning.  Almost half of the respondents interpreted Dr. Steckel's survey prompt as suggesting that they would interpret Chobani's "33% less sugar" claim to refer to sugar on a per flavor basis and/or on a per container basis – which is not the message Chobani intended to convey.  (Pl.'s Ex. ¶¶ 38–40.)  But more than 25% of respondents suggested that they might understand the claim as Chobani intended, which is to say, on a per ounce or across all flavors basis – and 10% or respondents would understand it completely, and so would be able to reach the conclusion that the claim was, by one rather convoluted measure, true.

In other words, the results of Dr. Steckel's survey, while mostly favorable to Dannon, come at a cost.  The Court simply cannot say that Chobani's advertisement is literally false.

14

However, the Court can readily conclude that Chobani's packaging is impliedly false, because the claim is misleading.

There can be no question that, read in the easiest and most straightforward way, the advertising on the Gimmies package is not accurate. A bottle of Gimmies has either 7 or 9 grams of sugar; a bottle of Danimials has either 9 or 10 grams of sugar. Even taking the biggest difference (7 grams to 10 grams), without any averaging, there is not 33% less sugar in a serving of Gimmies over a serving of Danimals.

Chobani contends that its statement is true because, calculated as an average across all flavors, and comparing a serving of Gimmies to 1.33 servings of Daminals, the math comes out right. But Chobani offers no persuasive evidence that a consumer would read the packaging in the manner needed to convey all the information that renders the 33% less claim true, or would understand in what sense the claim was true.

Dannon, by contrast, has offered persuasive extrinsic evidence that consumers would not understand what Chobani claims it is trying to convey with its packaging. Dr. Steckel's survey lends insight into how consumers process the very comparative claims advertised by Chobani. The results speak for themselves. Respondents were far more likely to interpret a comparative statement such as "Chobani's "33% less sugar claim" in the context of sugar content per serving (rather than per ounce) and as related to a specific flavor in question (rather than based on the averaging of all flavors). And only a very small fraction of respondents was likely to interpret the comparative claim posed in the survey to refer *both* to sugar content per ounce *and* derive from averaging across all flavors – indicating that very few consumers are likely to understand Chobani's advertisement.

It is also worth noting that the hypothetical used by Dannon's expert was actually quite favorable to Chobani. By offering respondents a menu of options from which to choose, the survey gave respondents the choice of adopting Chobani's intended interpretation; had the questions been open-ended, it is plausible that some respondents would not have contemplated that interpretation.

Dr. Pittaoulis' criticisms of Dr. Steckel's expert report are underwhelming. The Court flatly rejects the notion that, because the survey was close-ended, the questions that were asked were "leading." A leading question "suggests the answer," *i.e.*, the one and only answer, "to the person being interrogated." Black's Law Dictionary 1023 (10th ed. 2014). None of Dr. Steckel's survey questions did this.

Nor was a control group necessary to guard against bias or pre-existing beliefs about the parties or their products in the sort of study that Dr. Steckel conducted; his survey implicated neither Dannon nor Chobani and was deliberately designed in a way that ruled out any consumer bias in favor of or against either company.

Dr. Pittaoulis' remaining criticisms – that Dr. Steckel failed to replicate market conditions, survey the relevant consumer, or test the actual advertisements at issue – traffic in the classic logical fallacies of straw man and red herring. They castigate Dr. Steckel for failing to do something that was neither intended nor necessary to accomplish what Dr. Steckel set out do: design a descriptive survey "assess[ing] how U.S. consumers are likely to interpret a health-related claim of the type used by Chobani on the packaging of its Gimmies milkshake." (Pl.'s Ex. 28 ¶ 26.) Her criticisms might have been well-founded if this were the sort of confusion as to source study that is performed in most Lanham Act cases, but it is not.

Case law also supports the conclusion that Chobani's packaging is misleading. Particularly instructive is the Second Circuit's recent decision in *Mantikas et al. v. Kellogg Co.*, 910 F.3d 633 (2d Cir. 2018).

The facts of *Mantikas* are straightforward. A purported class of purchasers challenged the labeling on the front of two boxes of Cheeze-Its – one was conspicuously labeled "WHOLE GRAIN" on the front of the box, the other, "MADE WITH WHOLE GRAIN" – alleging that those labels misleadingly suggested that the crackers were predominantly whole grain, when, in fact, the primary grain content was enriched white flour – a fact that was clearly disclosed and readily available to consumers on the nutritional label. *Id.* at 635. The district court dismissed the complaint as a matter of law, reasoning that no reasonable consumer would think that the product's grain content was primarily whole grain when the nutritional label disclosed the exact amount of whole grain in the product and listed enriched white flour first on the ingredient list. *Id.* at 635–36.

The Second Circuit disagreed, holding that Cheeze-It's labeling could plausibly communicate to a reasonable consumer that the product's grain content was entirely or at least predominantly whole grain. *Id.* at 637. Despite acknowledging the general principle that a challenged advertisement must be considered "as a whole, including disclaimers and qualifying language," *id.* at 636–37 (citation omitted), the Second Circuit found that the ingredient list on the product's side panel did not cure the front label's potentially deceptive content. It reasoned that a reasonable consumer "'should not be expected to look beyond misleading representations on the front of the box to discover the truth [regarding the advertisement] in small print on the side of the box.'" *Id.* at 637 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)).

17

The same principle applies here. Reasonable purchasers of Gimmies who see "33% less sugar than the leading brand" on the front of the box cannot be expected to study the back of the packaging in the detail necessary to discover the cryptic, microscopic footnoted disclosures explaining Chobani's "33% less sugar claim" – never mind figure out what needs to be "averaged" with what and perform the multiple calculations needed to make sense of that claim. As revealed in Dr. Steckel's review of the academic literature, numerous studies across different types of products reveal that consumers are unlikely to notice or pay attention to Chobani's hard-to-find and hard-to-read "disclosure" footnotes, and frankly, the disclosures contained in those footnotes are not comprehensible.[6]  If the Second Circuit found mislabeling in *Mantikas* – where the disclosures were clear, easy to understand, and located in an area on the packaging that consumers generally tend to browse – then Dannon certainly has managed to make a preliminary showing of mislabeling here.

Chobani argues that liability cannot attach to its advertising, because the company has complied with applicable Federal Trade Commission ("FTC") and Federal Drug Administration ("FDA") regulations.  This argument fails for multiple reasons.

*First*, this is a Lanham Act case, not an agency enforcement action.  Regulatory compliance does not automatically negate Lanham Act liability.  *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 120–21 (2014).

*Second*, Chobani has not persuaded the Court that it is complying with the relevant regulations.

---

[6]      I do not agree with Dr. Pittaoulis that a literature review is irrelevant, or that Dr. Steckel had to perform his own "yogurt-specific" study in order for Dannon to establish a likelihood of success on the merits at this stage of the proceedings.

The only FTC rules that Chobani proffers is a FTC Enforcement Policy Statement on Food Advertising, dated May 13, 1994. *See* Federal Trade Commission, *Enforcement Policy Statement on Food Advertising* (May 13, 1994) *available at* http://www.ftc.gov/bcp/policystmt/ad-food.shtm ("FTC Guideline"). Chobani claims that it needed to compute the sugar content difference between Danimals and Gimmies using 4 fluid ounces as common volume for comparison, because this policy statement "requires" advertisers to "'make clear the basis for [a] comparison'" between foods, by, among other things, use of a "'common standard of measurement.'" (Chobani's Proposed Findings of Facts and Conclusions of Law ("Chobani's Br.") ¶ 34, Dkt. No. 37).

There are three problems with this argument.

First, the "common standard of measurement" language that Chobani quotes from the FTC Guideline comes from a section of the regulations governing "Absolute Nutrient Content Claims." *See* FTC Guideline III(A)(1). Obviously, Chobani's "33% less sugar" claim is not an "Absolute Nutrient Content Claim;" it is a comparative claim. The next section of the FTC Guideline governs "Comparative Nutrient Content Claims" – and it does not contain any language about using a "common standard of measurement." *See id.* III(A)(2). So, while using a common standard of measurement to make comparative nutrient content claims may be advisable, it is not required.

Second, even if a common standard of measurement were required for comparative nutrient content claims, Chobani confuses a necessary condition for a sufficient one when it argues that adherence to that rule makes its advertising not misleading. The relevant FTC Guideline about "Comparative Nutrient Content Claims" states that comparative nutrient content claims must not contain "misleading *implications*" in order to survive FTC scrutiny. *See id.*

19

(comparative nutrient content claim must eliminate "misleading implications")(emphasis added). It also requires that a party making "comparative [nutrient content] claims *should make clear* the basis for the comparison." *Id.* (emphasis added).  As discussed above, the reasoning behind Chobani's "33% less sugar" claim is anything but clear.

Third, the introductory note to the FTC Guideline states that it reflects an attempt by the FTC to "harmonize its advertising enforcement program with [the] FDA's food labeling regulations to the fullest extent possible[.]" *Id.*  The FTC therefore looks to FDA regulations under this document to evaluate the propriety of a comparative nutrient content claim.  Chobani cites two FDA regulations that allegedly support its position. Neither does.

The first regulation, 21 C.F.R. § 101.9, applies only to products that are labeled "light." Since Gimmies is not labeled with the word "light," that regulation is innapplicable.

The second regulation, 21 CFR 101.13(j), does apply to Chobani's claims because they are "relative claims other than light,' *including 'less' and 'more' claims.*" But that provision says:

> [T]he nutrient values, used to determine the claim *when comparing a <u>single manufacturer's product to the labeled product <u>shall be either the values declared in nutrition labeling or the actual nutrient values</u>, provided that the resulting label is internally consistent to (*i.e.*, *that the values* stated in the nutrition information, the nutrient values in the accompanying information and the declaration of the percentage of nutrient by which the food has been modified are consistent and *will not cause consumer confusion when compared*), and that the actual modification is at least equal to the percentage specified in the definition of the claim.

21 C.F.R. § 101.13(j)(1)(ii)(B)(emphasis added for clarity).  Rather than permitting manufacturers to average the sugar content of various flavors of a product type, § 101.13(j)(1)(ii)(B) explicitly states that a comparative advertisement must use the "values declared in nutrition labeling" or the "actual nutrient values," so as to ensure that any comparison

not cause consumer confusion.  While the Court concedes – as others have before it – that this regulation is not exactly a model of clarity, *see, e.g., Hawkins v. Kroger Co.*, 906 F.3d 763, 771–72 (9th Cir. 2018), it seems clear enough that it does not authorize Chobani to label its product as it did.

In the end, mindful that "context is crucial," *Mantikas*, 910 F.3d at 936, common sense must prevail.  As the Court noted at the preliminary injunction hearing, a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow, is not likely to study with great diligence the contents of a complicated product package, searching for and making sense of fine-print disclosures in asterisked footnotes, and looking for flavors other the one(s) s/he wishes to buy (which may or may not be on the shelf) in order to perform multiple mathematical calculations – all in order to confirm the truth or falsity of a claim that is of dubious veracity, and that could easily have been replaced with the simple and truthful statement, "My product has less sugar per ounce than his product."  Nor does the law expect this of the reasonable consumer. With yogurt or any other product, plain vanilla ads and labels tend to work best.

### 2.  *N.Y. Gen. Bus. Law § 349*

Section 349 prohibits "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).  A claim under § 349 requires a showing that (1) Chobani's act, practice, or advertisement was consumer oriented, (2) that it was materially deceptive and misleading, and (3) that Dannon was injured as a result. *Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*, No. 16 CIV. 3645 (KPF), 2017 WL 3129799, at *14 (S.D.N.Y. July 21, 2017) (internal citations omitted).

The standards for bringing claims under § 43 of the Lanham Act and § 349 of N.Y. Gen. Bus. Law § 349 are substantially the same. *In re Elysium Health-Chromadex Litig.*, No. 17-cv-

7394, 2018 WL 4907590, at *13 (S.D.N.Y. Sept. 27, 2018) (citing *Mimedx Grp., Inc.*, 2017 WL 3129799, at *14); *Playtex Prod., LLC* v.*Munchkin, Inc.*, No. 14 Civ. 1308 (RJS), 2016 WL 1276450, at *3 (S.D.N.Y. Mar. 29, 2016); *Church & Dwight Co.* v. *SPD Swiss Precision Diagnostics, GmbH*, No. 14 Civ. 585 (AJN), 2015 WL 4002468, at *17 n.14 (S.D.N.Y. July 1, 2015); *Avon Prods., Inc.* v. *S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997). Thus, the outcome is the same as well: Dannon is likely to succeed on the merits of its claim under § 349.

Nevertheless, Chobani argues that Dannon's § 349 claim fails, because Dannon has only alleged a competitor's injury that is insufficiently consumer-focused to sustain a claim under that provision.

This is not true. While also establishing a competitive injury, Dannon has demonstrated that Chobani's advertisements harm consumers as well, because it misleads parents about the sugar content of a product intended for their children. As one court has explained, the public "has a strong interest in receiving accurate information, especially when it comes to products marketed specifically for children." *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) (citing *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F. Supp. 470, 478 (S.D.N.Y. 1998).

Accordingly, Dannon has persuasively demonstrated that it will likely succeed on the merits of its Lanham Act and § 349 claims.

However, Dannon is nonetheless not entitled to injunctive relief.

### b. Dannon Has Not Established Irreparable Harm

A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d

Cir. 2009) (internal quotation marks and citation omitted).  To make such a showing, a plaintiff must demonstrate that, "[A]bsent a preliminary injunction, they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*  An injury that is compensable by monetary damages will not suffice except in extraordinary circumstances. *Id.*

In the context of the Lanham Act, where proof of actual or expected lost sales may be difficult to show, some courts find irreparable harm upon a showing that (*i*) the parties are competitors in the relevant market; and (*ii*) there is a logical causal connection between the alleged false advertising and the plaintiff's own sales position. *See, e.g., N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 518 (S.D.N.Y. 2013) (internal citation omitted).

No such finding can be made here.

The evidence presented at the preliminary injunction hearing indicates that Danimals' share of the overall yogurt market improved, and that Danimals itself had its second-best ever market share in its product class, during the month when Gimmies came to market.  (*See* Def.'s Ex. 14.)  This data strongly suggests that neither Danimals' sales position nor its brand equity has suffered irreparably.  While Dannon insists that sales of Danimals in particular fell during that period, Dannon's marketing executive who testified at the preliminary injunction hearing indicated that Danimals' December 2018 sales were in keeping with overall market trends that month. (*See* Prelim. Inj. Hr'g Tr. at 11:3-13:12.)  Dannon did not offer any hard evidence to rebut the Nielsen statistics, let alone offer any evidence, from consumers or otherwise, that Dannon lost any sales, or that (if it did) those losses were attributable to the "33% less sugar" claim, instead of, say, to the fact that Gimmies has less sugar than Danimals (if perhaps not 33%

less) or to the fact that Gimmies comes in a larger serving size.  It is pure conjecture that Dannon lost sales as a result of Chobani's misleading "33% less sugar" claim on the Gimmies packaging.

Setting aside lost sales – which would in any event be remediable at law – Dannon frames its purported irreparable injury as one to its reputation as a purveyor of a healthy and nutritious children's snacks.  "[I]n recognition that sugar content is a material aspect of parents' decision making in purchasing within the market segment," "Dannon has taken multiple steps to decrease the sugar content in its kids' yogurt and milk products[,] including by "exceeding its commitment for a Healthier America" and participating in the "Children's Food and Beverage Advertising Initiative."  (Pl.'s Ex. 1 ¶¶ 65–68.)

However, this purely conclusory testimony proves nothing.  Dannon may have decreased the sugar content in its kids' yogurt products, but there is no denying the fact that Danimals has more sugar per fluid ounce than Gimmies does.  Chobani has a perfect legal right to beat Dannon at its own game by marketing a competing product that has less sugar (and less sugar in more beverage to boot).  Chobani's advertising about how much less sugar its product contains may or may not be misleading – and this Court thinks it is misleading – but if Dannon's reputation is going to be injured because of sugar content, then it is as (or more) likely to be injured by the absolute sugar content of its own product – which is indisputably greater than Chobani's – as it is by the degree of the two products' relative sugar content.  Dannon offers not a shred of evidence tending to suggest that its reputation would be harmed if Chobani were allowed to advertise that it had 33% less sugar (as opposed to some slightly lower number that might be more accurate), but would not be harmed if mom just looked at the label and saw that Danimals had 9 grams of sugar (which is what every flavor now has) while Gimmies had 7 or 8.  This Court cannot infer reputational injury to the producer of a higher-sugar product on the record before it.

24

Further undermining Dannon's claim of irreparable injury is the revelation that it has been selling Danimals in stale packaging that overstates the sugar content of its product. Dannon argues that its use of outdated and erroneous packaging harms no one but itself, because it is not revealing that it has reduced the sugar content of three of its flavors, which should appeal to consumers. But it cannot be the case that Dannon's reputation depends upon the promotion of its products as having less sugar when the company is willing to sell its products in packaging that says they have more sugar than they actually do. Those two things do not jibe.

Finally, there is really nothing for the Court to redress by way of a preliminary injunction. A preliminary injunction is a forward-looking device; it seeks to halt ongoing behavior. Chobani – whether because of this lawsuit or not – has recognized that there is a problem with the first iteration of its packaging for Gimmies and is in the process of correcting it. That Chobani has both lessened the amount of sugar in two of its flavors and and redesigned its packaging to incorporate easy-to-understand and literally true statements about the relative amount of sugar between Gimmies and Danimals – revisions that are being introduced into the market even as this Memorandum Decision and Order is being written – counsels against the entry of an injunction. *See, e.g., Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 524 (S.D.N.Y. 2009). While it is true that the misleading packaging will not be entirely out of the market until a few weeks from now, Dannon's own use of stale packaging means that it does not lie in Dannon's mouth to argue that it will suffer irreparable harm. After all, Dannon was perfectly willing to sell Danimals in packaging that said the product inside had more sugar than it actually does – all to save money rather than to have to throw away incorrect packaging. That undermines any suggestion that Chobani's packaging is working irreparable harm on its competitor.

Dannon simply has not demonstrated that it will suffer irreparable harm to its reputation over the next few weeks, while Chobani's changes are being introduced into the marketplace.

### c. The Balance of Hardships Favors Chobani

In considering whether to issue a preliminary injunction, the Court also "must balance the hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

Chobani has persuaded the Court that it will be injured if a preliminary injunction issues. Because stickering over the "33% less sugar" claims on the product packaging that is already in stores is not a tenable option, a preliminary injunction would be "tantamount to a [forced] recall" of products that are otherwise safe for consumption. (Prelim. Inj. Hr'g Tr. at 114:18.) Doing so would cost Chobani millions of dollars in lost sales, wasted component ingredients, wasted slotting fees, labor costs, and the logistical expenses needed to effectuate the recall properly. It also would potentially jeopardize Chobani's relationships with retailers, at least in terms of its ability to put Gimmies back in stores, given that Gimmies is a new product without a longstanding record of consumer loyalty.

The Court also credits the testimony of Mr. Sandfort's testimony that recalling Gimmies from stores would very likely result in supermarkets pulling other Chobani children's products, even though they are not at issue in this case. (Sandfort Aff. ¶ 38; Prelim. Inj. Hr'g Tr. at 81:15-83:20.)

These harms are more concrete than Dannon's – at least on the evidence provided at this stage of the proceedings. To the extent Dannon has suffered its own financial injuries, those can be remedied at a later date.

### d. A Preliminary Injunction is Not Necessary to Vindicate the Public's Interest

26

As noted, the public has a general interest in truthful advertising relating to children's products. *See CJ Prod. LLC*, 809 F. Supp. 2d at 149. However, a preliminary injunction is not needed to advance that interest. Chobani is already selling reformulated versions of its "Cookies & Cream Crush" and "Bizzy Buzzy Strawberry" flavors in newly labeled packaging, ensuring that consumers will receive accurate information relating to the sugar content of those products. Under these circumstances, there is no exigency that requires the Court to take the extraordinary step of issuing a preliminary injunction.

## CONCLUSION

Based on the foregoing, the application for an order to how cause for a preliminary injunction is **DENIED**. The Clerk of Court is respectfully directed to open a motion at Dkt. No. 3 for purposes of entering a judgment denying the application for an order to show cause.

IT IS SO ORDERED.

Dated: January 23, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES